UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| LORAD, LLC, *d/b/a* Diversified Fall Protection, | ) ) | Case No.  1:20-cv-00357 |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | JUDGE BRIDGET MEEHAN BRENNAN |
| | ) | |
| AZTECA MILLING L.P., | ) | |
| | ) | **MEMORANDUM OPINION** |
| Defendant. | ) | **AND ORDER** |
| | ) | |

Lorad, LLC *d/b/a* Diversified Fall Protection ("DFP" or "Plaintiff") brought this action against a Texas food manufacturer called Azteca Milling, L.P. ("Azteca" or "Defendant"). Azteca filed counterclaims against DFP. Each side filed a summary judgment motion as to the other's claims. This Order resolves both pending motions.

I.    **Undisputed Facts**

The Court finds that the following facts are undisputed.[1]  Additional facts on which the parties disagree are discussed in Part II of this opinion along with the particular issues to which those disputed matters pertain.

A.    **Jurisdiction**

There is diversity of citizenship between the parties.  DFP is a limited liability company organized under the laws of the State of Ohio with its principal place of business in Westlake, Ohio.  (SF ¶ 1.)  Azteca is a limited partnership organized under the laws of the State of Texas with its principal place of business in Irving, Texas.  (SF ¶ 2.)  Azteca's general partner is GRUMA-

---

[1] Citations to "SF" refer to the *Joint Stipulation of Agreed Facts* filed jointly by the parties (Doc. No. 21).

ADM, Inc. and its sole limited partner is Gruma Corporation, both of which have their principal place of business in Irving, Texas.  (*Id.*)

### B.  The Parties' Dealings and Agreements

Azteca is a milling company that produces corn masa flour.  (Doc. No. 23 at PageID# 421.)  DFP specializes in the design, development, and manufacture of custom fall protection systems.  (*Id.*; Doc. No. 1 at ¶ 6.)  Azteca wanted to purchase a fall protection system for its corn silos.  (SF ¶ 3.)[2]

On or around July 19, 2013, Azteca's Health Safety & Environment Manager Oscar Garza ("Garza") and its Corn Manager Federico G. Ibarra ("Ibarra") met with DFP's Regional Sales Manager Ryan Spikowski ("Spikowski").  (SF ¶ 4.)  They discussed the need for fall protection systems in Azteca's silos, as well as a potential custom-made system from DFP.  (*Id.*)

Both sides admitted that a valid, enforceable contract existed between them.  (*See* Doc. No. 1 at ¶ 19; Doc. No. 11 Answer at ¶ 11 and Counterclaim at ¶ 47; Doc. No. 12 at ¶ 47; Doc. No. 23 at PageID# 422 & 428-29; Doc. No. 31 at PageID# 1268.)  The agreement between the parties was comprised of several documents, recounted chronologically below.

On July 24, 2013, DFP issued Proposal No. 6353 to Azteca reflecting the terms and conditions of a custom-made White Corn Silo Fall Protection Engineered Horizontal Lifeline System for corn silos located in Edinburg, Texas.  (SF ¶ 5.)  On August 23, 2013, DFP issued Proposal No. 6424 to Azteca reflecting the terms and conditions of a custom-made White Corn Silo Fall Protection Engineered Horizontal Lifeline System for corn silos located in Plainview, Texas.  (SF ¶ 6.)  The parties exchanged papers and payments related to this first "test" system.

---

[2] The U.S. Department of Labor's Occupational Safety and Health Administration ("OSHA") has regulations requiring certain employers to install fall protection systems.  *See, e.g.*, 29 C.F.R. §§ 1910.28, 1910.29, 1910.66(j) & 1926.502(d).

(SF ¶¶ 7-12.)

On July 15, 2014, Azteca sent DFP Purchase Order No. 4501939631 related to Proposal No. 6558, and DFP assigned Project No. 1255 to the engagement. (SF ¶ 14.)  On July 16, 2014, DFP sent Azteca a new proposal, Proposal No. 6558, regarding a custom-made fall protection system for Edinburg.  (SF ¶ 13.)  Proposal No. 6558 replaced Proposal No. 6353.  (*Id*.)

On August 5, 2014, DFP sent Azteca a new proposal, Proposal No. 6424-A, regarding the custom-made fall protection systems for Plainview.  (SF ¶ 15.)  Proposal No. 6424-A replaced Proposal No. 6424.  (*Id*.)  On August 19, 2014, Azteca sent DFP Purchase Order No. 4501958279 related to Proposal No. 6424-A, and DFP assigned Project No. 1263 to the engagement.  (SF ¶ 16.)

On October 2, 2014, DFP prepared design specification drawings for the custom-made fall protection systems requested under Project Nos. 1255 and 1263.  (SF ¶ 17.)  The design specifications and drawings were sent to Azteca for approval on October 6, 2014, and re-issued to Azteca for approval on November 6, 2014 and November 19, 2014.  (*Id*.)

On October 10, 2014, DFP sent Invoice No. 0007975-IN to Azteca for engineering services rendered for Project No. 1255 with payment due "Net 30 Days."  (SF ¶ 18.)  On October 28, 2014, DFP sent Invoice No. 0007993-IN to Azteca for engineering services rendered for Project No. 1263 with payment due "Net 30 Days."  (SF ¶ 19.)  On November 4, 2014, DFP received $112,699 from Azteca related to Invoice No. 0007975-IN and $39,257 from Azteca related to Invoice No. 0007993-IN.  (SF ¶ 20.)

By November 19, 2014, Azteca signed the design specification drawings for Project 1255 and the design specification drawings for 1263 and returned the signed drawings to DFP.  (SF ¶ 21.)  On or around December 16, 2014, DFP began procuring materials to fabricate the custom-

made fall protection systems for Azteca. (SF ¶ 22.) On or around January 23, 2015, DFP shipped all materials for Project No. 1263 to Azteca's Plainview facility. (SF ¶ 23.)

On January 23, 2015, DFP sent Invoice No. 0003111-IN to Azteca for materials related to Project No. 1263 with payment due "Net 30 Days." (SF ¶ 24.)

Between February 2, 2015 and February 8, 2015, DFP mobilized, installed, and conducted training on the custom-made fall protection systems in six (6) corn silos associated with Project 1263. (SF ¶ 25.) On February 3, 2015, DFP received $21,252 from Azteca related to Invoice No. 0003111- IN. (SF ¶ 26.) On February 8, 2015, Azteca and DFP signed a Project Sign-Off / Owner Acceptance Form for Project No. 1263. (SF ¶ 27.)

On February 9, 2015, DFP sent Invoice No. 0003126-IN to Azteca related to Project No. 1263 with payment due "Net 30 Days." (SF ¶ 28.) On February 24, 2015, DFP received $31,471 from Azteca related to Invoice No. 0003126- IN. (SF ¶ 29.)

On or around June 28, 2015, DFP shipped all materials for Project No. 1255 to Azteca's Edinburg facility. (SF ¶ 30.) On June 30, 2015, DFP sent Azteca Invoice No. 0003231-IN for half of the materials related to Project No. 1255 with payment due "Net 30 Days." (SF ¶ 31.)

Between June 29, 2015 and July 1, 2015, DFP mobilized, installed, and conducted training on the custom-made fall protection systems in four (4) silos associated with Project 1255. (SF ¶ 32.) The remaining twenty (20) silos were scheduled to be installed during the second mobilization reflected in Proposal No. 6558. (*Id.*)

On July 1, 2015, Azteca and DFP signed a Project Sign-Off / Owner Acceptance Form for Project No. 1255. (SF ¶ 33.) Between August 25, 2015 and September 1, 2015, DFP mobilized, installed, and conducted training on the custom-made fall protection systems in twelve (12) corn silos associated with Project 1255. (SF ¶ 34.) The remaining eight (8) silos were scheduled to

be installed during a third mobilization, which required a change order under the Proposal No. 6558.  (*Id.*)  On August 31, 2015, DFP sent Azteca Invoice No. 689 for half of the materials related to Project No. 1255 and payment due "Net 30 Days."  (SF ¶ 35.)

On September 1, 2015, Azteca and DFP signed another Project Sign-Off / Owner Acceptance Form for Project No. 1255.  (SF ¶ 36.)  On September 10, 2015, DFP sent Azteca Invoice No. 705 related to Project No. 1255 with payment due "Net 30 Days."  (SF ¶ 37.)

### 1.    Description of the Fall Protection System

Azteca's round corn silos were 48 feet in diameter and 48 feet high, with a hatch opening near the top.  (Doc. No. 27-3 at PageID# 987; Doc. No. 32-1 at PageID# 1349.)

The project here called for "DFP to design and engineer (2) approx. 45 foot long combination Rigid Tube and horizontal lifeline systems each for (24) silos rated for (2) users each line in restraint."  (Doc. No. 32-1 at PageID# 1349-50; *see also* Doc. No. 27-3 at PageID# 987-88.)  The tubes and lifelines were "to be offset at an angle forming a 'V' shape from the point of the access hatch," so that "[w]orkers will be able to walk the system to take samples near the center of the silo."  (*Id.*)  The diagram below was included in proposals to show the anticipated placement of the fall protection system:



(Doc. No. 27-3 at PageID 989; Doc. No. 32-1 at PageID# 1351; Doc. No. 1-1 at PageID# 11-12.)

### 2.    Payment Terms

DFP's proposals included the following payment schedule: 50% upon submission of engineering design for approval, 25% upon shipment of materials to installation site, and 25% upon completion of installation and training.  (Doc. No. 1-1 at PageID# 13; Doc. No. 32-1 at PageID# 1352.)  Any "retainage if applicable to be paid net 45 after completion of [i]nstallation and training."  (*Id.*)

### 3.    A Safety Apparatus Detaches from an Edinburg Silo

On October 7, 2015, Azteca discovered one of the custom-made fall protection systems separated from the silo wall in Edinburg and provided notice to DFP via email the same day.  (SF ¶ 38.)  In turn, DFP requested that all systems be tagged out for inspection under the one-year limited warranty provided by DFP.  (*Id.*)  No one was using the system when it separated from the silo wall, and no one witnessed the separation.  (*Id.*)  However, Azteca took pictures of system after the separation and provided those pictures to DFP.  (*Id.*)

By November 3, 2015, the custom-made fall protection systems were uninstalled and returned to DFP for inspection.  (SF ¶ 39.)  Edinburg silos 3, 5, 8, and 20 could not be uninstalled until January 7, 2016 due to corn levels, and silo 7 was not ready until March 7, 2016.  (*Id.*)  Therefore, those systems were uninstalled and returned on those dates.  (*Id.*)

### 4.    Third-Party Consultant Offers Advice

On December 12, 2015, DFP prepared a Root Cause Analysis Report with Corrective Forms.  (SF ¶ 40.)  In order to repair or replace the custom-made fall protection system, DFP hired Charles Miller, Jr. of Element Materials Technology ("Miller"), an independent third-party consultant.  (SF ¶ 41.)  He performed tests on the rigid strut assembly, assessed the aluminum welds, and made recommendations on weld techniques that could strengthen the design.  (*Id.*)  The results of those tests were provided to Azteca.  (*Id.*)

6

On July 7, 2016, DFP and Azteca agreed to install a test system in Edinburg silo 11, which incorporated the recommendations of Miller.  (SF ¶ 42.)  The parties would, then, monitor the test system for several months to see how it reacted to the expansion and compression of the silo. (*Id.*)

### 5.  More Systems Detach from Silos

On January 23, 2017, Azteca discovered one of the custom-made fall protection systems separated from the silo wall in Plainview and provided notice to DFP via email on January 24, 2017.  (SF ¶ 43.)  By February 10, 2017, the custom-made fall protection systems were uninstalled from Plainview.  (SF ¶ 44.)  From February 10, 2017 to March 17, 2017, DFP tested the systems.  (*Id.*)  On March 23, 2017, DFP presented the modified system and provided design specification drawings for the modifications, all of which were approved by Azteca.  (SF ¶ 45.)

On or about May 31, 2017, DFP shipped all materials for the modified system to Azteca's facility in Edinburg for installation in the corn silos.  (SF ¶ 46.)  Between June 5, 2017 and June 8, 2017, DFP and/or its contractors installed the redesigned fall protection system in silos 7, 8, 9, 10, 12, 13, 14 and 15 in Edinburg.  (SF ¶ 47.)

On September 7, 2017, Azteca discovered that a fall protection system in silo 15 had separated from the wall in Edinburg and provided notice to DFP the same day.  (SF ¶ 48.)  By January 9, 2018, DFP had uninstalled all redesigned systems at Azteca.  (SF ¶ 49.)

### 6.  Azteca Looks to Change Vendors

On or before February 9, 2018, Azteca began soliciting bids from Decker Consulting to design or install fall protection systems in its corn silos at Edinburg and Plainview.  (SF ¶ 50.)

On March 22, 2018, Azteca met with DFP to discuss the custom-made fall protection system.  (SF ¶ 51.)  During the meeting, DFP made another proposal to replace the system that

separated in September of 2017.  (*Id.*)  Azteca did not approve the proposal.  (*Id.*)

On November 15, 2019, counsel for Azteca sent a letter to DFP demanding compensation for the systems and damages caused by the defective equipment.  (SF ¶ 52.)  On December 20, 2019, counsel for DFP sent a letter to counsel for Azteca denying liability and demanding payment on outstanding invoices.  (SF ¶ 53.)

## II.  Law and Analysis

### A.  Standard of Review

"A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought."  Fed. R. Civ. P. 56(a). "Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and affidavits show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  The moving party bears the burden of showing that no genuine issues of material fact exist."  *Williams v. Maurer*, 9 F.4th 416, 430 (6th Cir. 2021) (citations and quotations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Mining Mach., Inc. v. Copley*, 145 F. App'x 149, 152 (6th Cir. 2005) ("The moving party bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record that establish the absence of a genuine issue of material fact.").

> A party is entitled to summary judgment if she shows 'there is no genuine dispute as to any material fact and . . . [she] is entitled to judgment as a matter of law.'  Fed. R. Civ. P. 56(a).  A 'material' fact is one that 'might affect the outcome of the suit under the governing law.'  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  And a genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party.

*Abu-Joudeh v. Schneider*, 954 F.3d 842, 849-50 (6th Cir. 2020) (additional citations and quotations omitted).

"[O]n summary judgment the inferences to be drawn from the underlying facts ... must be

viewed in the light most favorable to the party opposing the motion."  *United States v. Diebold*, 369 U.S. 654, 655 (1962); *see also Kalamazoo Acquisitions, L.L.C. v. Westfield Ins. Co.*, 395 F.3d 338, 342 (6th Cir. 2005) ("The district court . . . must view the facts and any inferences reasonably drawn from them in the light most favorable to the party against whom judgment was entered."); *Burgess v. Fischer*, 735 F.3d 462, 471 (6th Cir. 2013)  ("[T]he evidence is construed and all reasonable inferences are drawn in favor of the nonmoving party.").

A party asserting (or disputing) a fact must cite evidence in the record or show that the record establishes the absence (or the presence) of a genuine dispute.  *See* Fed. R. Civ. P. 56(c) and (e).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3); *see also Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.").  Rule 56(e) provides in relevant part that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may ... consider the fact undisputed for purposes of the motion . . . [or] grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it."  Fed. R. Civ. P. 56(e).

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  However, the Court's role is not to make credibility determinations or 'weigh' conflicting evidence.  *Payne v. Novartis Pharms. Corp.*, 767 F.3d 526, 530 (6th Cir. 2014); *Arban v. W. Publ'g Corp.*, 345 F.3d 390, 400 (6th Cir. 2003).  "The ultimate question is whether the evidence presents a sufficient factual disagreement to require submission

of the case to the jury, or whether the evidence is so one-sided that the moving parties should prevail as a matter of law." *Payne*, 767 F.3d at 530.

"The burden of showing the absence of any such genuine issues of material facts rests with the moving party . . . ." *McFall v. Motorcars Acquisition IV, LLC*, No. 1:15-CV-1170, 2016 WL 3777828, at *3-4 (N.D. Ohio May 20, 2016). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the evidentiary record] if any, which it believes demonstrates the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323 (citation omitted). "Once the moving party satisfies its burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact." *Queen v. City of Bowling Green*, 956 F.3d 893, 898 (6th Cir. 2020) (quotation and citations omitted).

## B. Choice of Law

To begin, the Court must determine which legal rules govern the resolution of the parties' dispute. DFP described this as a dispute over the sale of goods, to which the Court must apply Ohio law. (Doc. No. 27 at PageID# 968-69; Doc. No. 33 at PageID# 1398-401.) Azteca argued that the deal was primarily for construction services to real property in Texas, to which both states would apply the law of the *situs*. (Doc. No. 32 at PageID# 1330-33.) As discussed below, state selection here follows plainly from federal and state choice-of-law rules. The more consequential question arises from the parties' dueling goods/services descriptions: *i.e.*, whether the Uniform Commercial Code ("UCC") or general contract doctrine will govern the case. (*See* Doc. No. 23 at PageID# 428 n.25.)

### 1. Ohio or Texas Law

"Federal courts apply the law of the state in which they sit, 'including that state's choice of law provisions.'" *Imaging Fin. Servs., Inc. v. Lettergraphics/Detroit, Inc.*, 178 F.3d 1294, at

*3 (6th Cir. 1999) (quoting *Davis v. Sears, Roebuck & Co.*, 873 F.2d 888, 892 (6th Cir. 1989));

*see also Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Erie R.R. Co. v.*

*Tompkins*, 304 U.S. 64 (1938); *Sims Buick-GMC Truck, Inc. v. Gen. Motors LLC*, 876 F.3d 182,

185-86 (6th Cir. 2017); *Montgomery v. Wyeth*, 580 F.3d 455, 459 (6th Cir. 2009).  Accordingly,

this Court must follow Ohio choice-of-law principles to determine whether the substantive

doctrines of Ohio or Texas will apply.  (*Compare* Doc. No. 27 at PageID# 968 *with* Doc. No. 32

at PageID# 1330.)

### a)       Necessity of a Conflict

"Under Ohio law, before engaging in any choice of law analysis, a court must first

determine whether such analysis is necessary." *Mecanique C.N.C., Inc. v. Durr Env't, Inc.*, 304

F. Supp. 2d 971, 975 (S.D. Ohio 2004).  "[A]n actual conflict between Ohio law and the law of

another jurisdiction must exist for a choice-of-law analysis to be undertaken." *Glidden Co. v.*

*Lumbermens Mut. Cas. Co.*, 861 N.E.2d 109, 115 (Ohio 2006).

"Under Ohio law, the party seeking application of the law of another state must show, at

the outset, the existence of a genuine conflict between Ohio law and the law of the foreign

jurisdiction." *Sirlouis v. Four Winds Int'l Corp.*, No. 1:10-CV-00469, 2012 WL 1068709, at *4

(N.D. Ohio Mar. 29, 2012) (citing *Glidden*).  Thus, "the party asserting the application of the

foreign law has the initial burden to demonstrate such a conflict." *Cross v. Carnes*, 724 N.E.2d

828, 836 (Ohio Ct. App. 11th Dist. 1998).  "Where the party seeking application of the law of a

foreign jurisdiction fails to demonstrate a conflict between local law and the law of that

jurisdiction, local law – here Ohio law – governs." *Mecanique*, 304 F. Supp. 2d at 975; *see also*

*Akro-Plastics v. Drake Indus.*, 685 N.E.2d 246, 248 (Ohio Ct. App. 11th Dist. 1996) ("Local law

applies if the party alleging that the law of a foreign jurisdiction applies fails to demonstrate a

11

conflict between local law and the law of that jurisdiction.").  Here, Azteca is the party who

urged application of Texas law, and so it carries the initial burden.

### b)    Azteca's Rationale for Texas Law

In response to DFP's motion for summary judgment on the counterclaims, Azteca set

forth its explanation for why Texas law "controls the disposition of this action."  (Doc. No. 32 at

PageID# 1330 (capitalization removed).)

> [T]his action involves the design, manufacture, installation and training of
> custom-made fall protection systems that were to be installed in corn silos
> in Azteca's Edinburg and Plainview, Texas facilities—Azteca's real
> property located in Texas.  These fall protection systems were intended to
> be permanent fixtures inside Azteca's corn silos.  Both Texas and Ohio law
> provide that construction contracts in their respective states involving real
> property located in that state are subject to the laws of the state where the
> real property is located.  Ohio Revised Code § 4113.62(D)(1); Tex. Bus. &
> Com. Code Ann. § 272.001.41.  In this case, the fall protection systems that
> were assembled and welded inside Azteca's corn silos were fixtures to
> Azteca's corn silos on Azteca's real property located in Texas.  Therefore,
> under both Ohio and Texas law, Texas law controls.

(*Id.*)

It was incumbent upon Azteca to show some material difference between Texas and Ohio

law in order to trigger a conflicts of law analysis.  Pointing out just one respect in which the two

state statutory schemes *are alike* (which is how Azteca described them) does not illustrate a

conflict.  "If the competing states would use the same rule of law or would otherwise reach the

same result, there is no need to make a choice of law determination because there is no conflict

of law."  *McDonald v. Williamson*, 2003-Ohio-6606, 2003 WL 22922271, at *2 (Ohio Ct. App.

8th Dist. 2003); *see also Cross*, 724 N.E.2d at 836 (applying Ohio law where party's brief cited

both New York and Ohio law and failed to demonstrate any conflict of law in the two

jurisdictions).

The more significant problem for Azteca is that neither of these two state statutes would

result in Azteca's preferred outcome, as discussed below.

### c)      The Two Construction Contract Statutes

The silos were located in Texas.  Section 4113.62 applies only with respect "to real estate in this state."[3]  Ohio Rev. Code § 4113.62(D)(1).  Nothing in Section 4113.62(D)(1) prohibits the application of Ohio law to a contract related to improvements for property located in Texas.  This provision is agnostic as to what law governs real estate located outside Ohio (or construction contracts related thereto).  Azteca incorrectly asserted that Section 4113.62(D)(1) provides that "Texas law controls" a contract for "fixtures to Azteca's corn silos on Azteca's real property located in Texas."  (*See* Doc. No. 32 at PageID# 1330.)  This statute simply does not speak one way or the other as to property located in Texas.

The Texas counterpart statute that Azteca cited "applies only to a construction contract concerning real property located in this state."  Tex. Bus. & Com. Code Ann. § 272.001(a).  The Court will presume without deciding that the contract here comes within this scope.  Even assuming that, the statute does not benefit Azteca.

> If a construction contract or an agreement collateral to or affecting the construction contract contains a provision making the contract or agreement or any conflict rising under the contract or agreement subject to another state's law . . . *that provision is voidable by a party obligated by the contract or agreement to perform the work* that is the subject of the construction contract.

Tex. Bus. & Com. Code Ann. § 272.001(b) (emphasis added).

First, Section 272.001(b) applies only where a contract "contains a provision . . .

---

[3] "Any provision of a construction contract, agreement, understanding, or specification or other document or documentation that is made a part of a construction contract, subcontract, agreement, or understanding for an improvement, or portion thereof, to real estate in this state that makes the construction contract or subcontract, agreement, or other understanding subject to the laws of another state is void and unenforceable as against public policy."  Ohio Rev. Code § 4113.62(D)(1).

making" the contract or a dispute over that contract subject to another state's law or forum.  That is not the case here.  Neither side pointed the Court to any written choice-of-law or choice-of-forum clause in the documents that comprise or evidence the contract(s) between them (*e.g.*, DFP's proposals and Azteca's purchase orders).  Because Section 272.001 would only operate against a type of contract clause that does not exist here, Section 272.001 does not compel application of Texas law here.

Second, Azteca would not succeed under Section 272.001 even if the parties' contract (rather than choice of law doctrines) were at work.  Section 272.001 does not render a choice-of-law or choice-of-forum clause void.  It merely renders such a clause *voidable* – and only by the party contracting to do the work in a construction or improvements project.[4]  Here, that party would be DFP, who obviously elected *not* to insist upon application of Texas law.  Section 272.001 does not empower the property owner hiring construction workers to void anything.  The statute thus does not advance Azteca's argument.

Section 272.001(b) cannot be characterized as indicative of some general principle that Texas insists upon application of its own law construction contracts where the work occurs in Texas.  If that was the point, then the statute would render matters void, not voidable.  Similarly, one cannot derive from Section 272.001 a principle of insulating Texas property owners from out-of-state laws or forums.  If that was the aim, it would be Texas property owners who would be afforded the option to invalidate a contract clause.  Instead, this choice was granted only to contractors doing the construction work.

---

[4] "Under the common law, a 'void' act is one which is entirely null, not binding on either party, and not susceptible of ratification.  In comparison, a voidable act is one which is obligatory upon others until disaffirmed by the party with whom it originated and which may be subsequently ratified or confirmed." *Wood v. HSBC Bank USA, N.A.*, 505 S.W.3d 542, 547 (Tex. 2016) (citations and quotations omitted).

14

Of the two state statutes Azteca relied upon, neither bars application of Ohio law here. Neither would compel application of Texas law either.  Azteca's two cited statutes therefore do not demonstrate a conflict between the laws of Texas and Ohio.  At most, those statutes render Ohio and Texas alike with respect to the choice of law outcome for this case.

### d) Azteca's Implicit Concession of No Substantive Conflict

The two state statutes Azteca relied on were choice of law statutes specific to construction contracts.  But nowhere did Azteca show that the relevant *substantive* laws of Texas and Ohio differ in any respect material.

DFP argued: "There is no conflict between the Uniform Commercial Code adopted in Ohio versus the version adopted in Texas.  *See, generally,* R.C. 1302.01 *et seq*., Tex. Bus. & Com § 2.101 *et. seq*." (Doc. No. 27 at PageID# 968.)  Counts Two and Three of Azteca's counterclaims seem to bear that out, as both were pled in the alternative under Texas' and Ohio's versions of the UCC.  (*See* Doc. No. 11 at PageID# 262 n.1 & 264 n.2; *see also* Doc. No. 32 at PageID# 1330 n.42.)  Indeed, Azteca affirmatively asserted that Texas and Ohio law would yield the same or similar results on most of the key issues in the case.  (*See* Doc. No. 23 at PageID# 428 n.25, 430 n.28 & n.29, & 432 n.31.)

For example, on the issue of timeliness and limitations, Azteca's briefs analyzed Ohio statutes and case law – with almost no discussion of Texas law on limitations and timeliness. Azteca concluded that "even if this Court were to determine that Ohio law controls – which Azteca disagrees – Azteca's claims still survive because the claims are not time barred under Ohio law." (Doc. No. 32 at PageID# 1330.)  Nowhere did Azteca indicate that the timeliness of its counterclaims turned in any way on the selection of either state's law.  (*See id*. at PageID# 1331-33.)  Azteca's position on both the claims and counterclaims sounding in contract, express

15

warranties, and implies warranties all were supported using Ohio law – not Texas law.  (*See id.* at PageID# 1333-40.)

Azteca's briefs neither indicated nor demonstrated that selection of Ohio or Texas law would change any element or any outcome on a claim or counterclaim.  There was no suggestion that choice of law here would yield different remedies or damages.  *See Gouge v. BAX Glob., Inc.*, 252 F. Supp. 2d 509, 521 (N.D. Ohio 2003) (applying Ohio law because party seeking application of another state's law did not present evidence showing that such law differed meaningfully from Ohio law); *Avenell v. Westinghouse Elec. Corp.*, 324 N.E.2d 583, 586 n.3 (Ohio Ct. App. 8th Dist. 1974) (applying Ohio law where "there is no significant difference in the application of the law in the two jurisdictions").

For these reasons, the Court applies Ohio law in this action.

### 2.    Uniform Commercial Code or General Contract Law

Having concluded that Ohio law applies here, the Court next reviews the parties' competing characterizations of their contract.  DFP emphasized a sale of goods, while Azteca focused on the provision of services.  "The distinction is important, because a contract for the purchase of goods is subject to the strictures of the UCC." *Allied Erecting & Dismantling Co., Inc. v. Ohio Edison Co.*, 34 N.E.3d 182, 186 (Ohio Ct. App. 7th Dist. 2015).  Thus, by emphasizing different aspects of the deal the parties asserted different sets of legal rules. "Significantly, depending on whether a contract is for goods or services, Article 2 applies in its entirety or not at all." *Timken Co. v. MTS Sys. Corp.*, 539 F. Supp. 3d 770, 780 (N.D. Ohio 2021) (citing 67 AM. JUR. 2D SALES § 31 (2014)).  A contract for services would be "governed by common law contract principles and not by Ohio Rev. Code § 1302." *Tekfor, Inc. v. SMS Meer Serv., Inc.*, No. 5:12-CV-1341, 2014 WL 5456525, at *5 (N.D. Ohio Oct. 27, 2014).

The Court starts with two basic points of agreement.  Both sides recognized that this

question should be answered by applying the predominant-purpose legal test.  (Doc. No. 32 at

PageID# 1331 (quoting *Allied Indus. Serv. Corp. v. Kasle Iron & Metals, Inc.,* 405 N.E.2d 307,

310 (Ohio Ct. App. 6th Dist. 1977)); Doc. No. 33 at PageID# 1399 (quoting *Timken*, 539 F.

Supp. 3d at 784-85).  And that is because both sides acknowledged that their deal had DFP slated

to provide *both* goods and services.  (*See id.*)  These are sometimes referred to as "hybrid"

contracts.  *E.g.*, *Action Grp., Inc. v. NanoStatics Corp.*, 2013-Ohio-5542, 2013 WL 670839 at *8

(Ohio Ct. App. 10th Dist. 2013).

### a)      The Predominant Purpose Test

Today's legal test was articulated nearly 50 years ago:

> Having reviewed the out-of-state cases, we adopt the following approach
> developed in a case such as the one before us which involves a mixed goods
> and services contract: the test for the inclusion in or the exclusion from sales
> provisions is whether the predominant factor and purpose of the contract is
> the rendition of service, with goods incidentally involved, or whether the
> contract is for the sale of goods, with labor incidentally involved.

*Allied Indus.*, 405 N.E.2d at 310.  "Put more simply, the question is whether 'the purchaser's

ultimate goal is to acquire a product or procure a service.'"  *H & C Ag Servs., LLC v. Ohio Fresh

Eggs*, LLC, 41 N.E.3d 915, 922 (Ohio Ct. App. 3d Dist. 2015) (quoting *Mecanique*, 304 F. Supp.

2d at 977).

"The predominate purpose test turns not on whether the *claims* concern the sale of goods,

but instead on whether the *contract* is predominantly for the sale of goods."  *Executone of

Columbus, Inc. v. Inter-Tel, Inc.*, 665 F. Supp. 2d 899, 911-12 (S.D. Ohio 2009) (emphasis in

original).  Courts look first to the language in the within the four corners of a sales contract to

determine this purpose.  *See Jandreau v. Sheesley Plumbing & Heating Co*., 324 N.W.2d 266,

269 (S.D. 1982); *Bonebrake v. Cox*, 499 F.2d 951, 958 (8th Cir. 1974) (cited with approval in

*Allied Indus.*, 405 N.E.2d at 310 and *Lost Nation North Apartments v. Alside Builders Serv.*, No.

43927, 1982 WL 5922, at *4 (Ohio App. 8th Dist. Sept. 23, 1982), *amended*, No. 43927, 1982 WL 5931 (Ohio App. 8th Dist. Sept. 30, 1982)).

Generally, "[t]his is a factual question and is to be determined by a review of the contractual language and the circumstances surrounding the contract formation and expected performance." *Renaissance Techs., Inc. v. Speaker Components, Inc*., 2003-Ohio-98, 2003 WL 118509, at *1 (Ohio Ct. App. 9th Dist. 2003). That may mean the determination will go to a jury "where the facts are not clear," though a jury is unnecessary if "there are no disputed facts as to the predominant purpose of the contract. When the predominant purpose of the contract is undisputed, the matter becomes a question of law." *Allied Erecting*, 34 N.E.3d at 185-86 (internal citation omitted); *see also Wagner-Meinert, Inc. v. EDA Controls Corp.,* No. 06-3777, 2007 WL 579668, at *2 (6th Cir. Feb. 23, 2007) ("Because we find no disputed facts as to the nature of the sales contract at issue, it was proper for the district court to rule as a matter of law on the nature of the contract and to determine that the four year statute was applicable.").

"The burden of proving that a contract is primarily for the purchase of goods is on the party who asserts the contract is governed by" the UCC. *Tekfor*, 2014 WL 5456525, at *4 (citing *Renaissance*, 2003 WL 118509, at *1); *accord Timken*, 539 F. Supp. 3d at 785; *Mecanique*, 304 F. Supp. 2d at 976; *Valleaire Golf Club, Inc. v. Conrad*, 2003-Ohio-6575, 2003 WL 22900451, at *2 (Ohio Ct. App. 9th Dist. 2003) ("The fact that the facts presented a 'close call' merely demonstrated that the issue was a factual question, not that it was one that could not be decided by the trial judge . . . ."). Here, DFP has the burden to show why the UCC applies. *Allied Erecting*, 34 N.E.2d at 186; *Allied Industrial*, 405 N.E.2d at 310.

### b) Goods & Services

The Ohio UCC defines goods broadly:

> "Goods" means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities, and things in action.  "Goods" also includes . . .  other identified things attached to realty as described in section 1302.03 of the Revised Code.

Ohio Rev. Code § 1302.01(A)(8).  "The definition of goods is based on the concept of movability."  Ohio Rev. Code Ann. § 1302.01 (West) (Comment 1 to UCC 2-105).

That items are destined to be affixed to real property does not preclude them from being classified as goods.  *E.g.*, *Stahl v. Neff*, 2008-Ohio-5195, 2008 WL 4455604, at *1 (Ohio App. 3d Dist. 2008) (holding that manufactured homes constitute goods under the UCC); *Fuqua Homes, Inc. v. Evanston Bldg. & Loan Co.*, 370 N.E.2d 780, 781 (Ohio Ct. App. 1st Dist. 1977) (holding that modular home units, which were movable at time of sale to buyer and until their subsequent assembly and installation on realty for use as house, were goods within meaning of the UCC); *Valley  Farmers' Elevator v. Lindsay Bros. Co.*, 398 N.W.2d 553, 556 (Minn. 1987) (holding that equipment installed into grain storage facilities was a sale of goods governed by the UCC even though those goods were then affixed to real property), *overruled on other grounds*, *Hapka v. Paquin Farms*, 458 N.W.2d 683 (Minn.1990)).  That a transaction may have some relation to real estate does not preclude a finding that it was predominantly a sale of goods.  *E.g.*, *Cranpark, Inc. v. Rogers Grp., Inc.*, 721 F. Supp. 2d 613, 640 (N.D. Ohio 2010), *rev'd on other grounds*, 498 F. App'x 563 (6th Cir. 2012).[5]

> [T]he scope of coverage of "goods" is not to be given a narrow construction but instead should be viewed as being broad in scope as to carry out the underlying purpose of the Code in achieving uniformity in commercial

---

[5] That said, Azteca correctly noted that a contract for real property is not the sale of goods.  *See, e.g.*, *Rosenow v. Shutrump & Assoc.*, 839 N.E.2d 82, 87-88 (Ohio Ct. App. 7th Dist. 2005) (holding that a real estate purchase contract involving the purchase of a home is not subject to UCC Article 2).

transactions. The Code, which by its own terms, § 1-102, is to be liberally construed, should be uniformly applied to achieve its purposes.

*Mead Corp. v. McNally-Pittsburg Mfg. Corp.*, 654 F.2d 1197, 1199 n.1 (6th Cir. 1981) (quoting

*Pittsburgh-Des Moines Steel Co. v. Brookhaven Manor Water Co.*, 532 F.2d 572, 580 (7th Cir.

1976)); *cf. Neibarger v. Universal Coops., Inc.*, 486 N.W.2d 612, 622 (Mich. 1992) (holding that

farmers' claims related to defective milking system arose from a contract predominantly for sale

of goods and were governed by the UCC).

Here the fall protection equipment systems were goods. They were movable and shipped

before installation. (SF ¶¶ 23, 30, 44, 46, & 49.) Even after original installation, once

equipment failed in one silo, all equipment was uninstalled and shipped back to Ohio for

analysis. (SF ¶ 39.) As for services, both sides agree that those were defined in the written

proposals. (*See* Doc. No. 32 at PageID# 1322-26; *id.* at PageID# 1331-33; Doc. No. 33 at

PageID# 1400-01.) *Cf. Meeker v. Hamilton Grain Elevator Co.*, 442 N.E.2d 921, 922-23 (Ill. Ct.

App. 1982) (holding that contract for specially built grain bins was predominantly for goods).

### c) The Parties' Contentions

Azteca framed the issue as follows:

> DFP contracted with Azteca to design, manufacture, install and provide training on a custom-made, unique, "first of its kind" fall protection systems to be welded and attached to corn silos at Azteca's real property as a fixture. Azteca's claim against DFP is not simply for the sale of some custom-made widget, but rather for DFP's services to design, manufacture, install and train Azteca on a "first of its kind" fall protection system to be permanently welded inside Azteca's corn silos.

> Despite the fact goods (custom-made fall protection systems) were one part of this transaction, Azteca contracted with DFP because DFP offered OSHA certified engineering, designing, manufacturing, installation and training services for these first-of-its-kind systems that would work in Azteca's corn silos. In other words, Azteca's agreement with DFP that is the center of this dispute involves a mix of goods and services.

20

(Doc. No. 32 at PageID# 1331.)  To show predominance, Azteca first suggested that "seventy-five percent (75%) of the agreed upon price is directly tied to services DFP agreed to provide[.]" (*Id.* at PageID# 1332.)  Azteca then argued:

> According to the plain language of DFP's proposals, DFP agreed to provide Azteca OSHA compliant "Complete Turnkey Services" including professionally trained project managers, system design by in-house fall protection engineers, fabrication by OSHA certified fabricators, OSHA certified installation, OSHA certified training, fall protection liability coverage, professional engineers liability coverage, and future inspection/testing services.

(*Id.* at PageID# 1332-33.)  Azteca described its counterclaim against DFP as "predominately service oriented," which follows from DFP's failure to provide "a properly designed system" or to "complete installation and training of the systems[.]"  (*Id.* at PageID# 1333.)

DFP pointed out that Azteca itself pled that the UCC applied to this transaction (albeit the Texas version of the UCC).  (Doc. No. 27 at PageID# 968.)  DFP suggested that the stipulated facts here show that the predominant purpose of the agreement here was for goods.  (Doc. No. 33 at PageID# 1397.)

> Azteca contracted with DFP because it promised the United States Department of Labor, Occupational Health and Safety Administration ("OSHA"), that it would install a fall protection system in its corn silos. [Doc. 24-1, PageID #493, p. 24, ln. 17-22.] . . . Azteca's goal was to secure a product covered by the U.C.C.

(*Id.* at PageID# 1399.)  DFP urged that the parties "intended this transaction to be covered by Article 2 based on the language used in the Proposal[s] . . . [which] specifically use terms like 'warranty' and 'FOB' which are synonymous with a transaction in 'goods' under the U.C.C." (*Id.* at PageID# 1400.)  The parties included sketches of how the safety equipment would look in the silos.  (*Id.*)

Azteca pled that "DFP specializes in the design, development, and manufacturing of highly individualized and custom fall protection equipment," which DWP cited as an

21

acknowledgement that its business was one for goods.  (Doc. No. 11 at PageID# 257 ¶ 11.)
Finally, DFP argued that it "is not in the business of selling its design or engineering services
outside the context of its commercial products, and all the alleged 'services' were specifically
tailored to deliver the fall protection equipment at issue."  (Doc. No. 33 at PageID# 1401.)

### d)     What Azteca Pled

The Ohio Court of Appeals has explained that the way a party described the contract in
its pleading is a factor to considered when resolving whether goods or services predominate.  *See
Action Group*, 2013 WL 6708395, at *9.  Moreover generally, parties "are bound by admissions
in their pleadings, and a party cannot create a factual issue by subsequently filing a conflicting
affidavit."  *Hughes v. Vanderbilt Univ.*, 215 F.3d 543, 549 (6th Cir. 2000).

Azteca pled – and thereby admitted – that its deal with DFP was subject to the UCC.
(*See* Doc. No. 11 at PageID# 256 *et seq.*)  The italicized language below from Azteca's
Counterclaim show the prominence of goods and equipment:

> 9.  In order to ensure safety of its personnel, Azteca utilizes *safety equipment*
> for its employees to protect them from falls when there is a need to enter a
> silo. Azteca historically *purchases safety equipment, including safety
> equipment for its silos, from various vendors.*
>
> 10.  Azteca was first introduced to DFP in 2013 after another vendor
> suggested Azteca contact DFP's Houston, Texas based representative, Mr.
> Ryan Spikowski, *who sells DFP's custom-made fall protection equipment.*
>
> 11.  DFP specializes in the *design, development, and manufacturing* of
> highly individualized and custom fall protection systems.
>
> 12. In 2013, Azteca telephoned DFP's Texas representative to inquire about
> purchasing custom-made fall protection equipment.
>
> 13. Soon thereafter, Azteca *purchased a one-man fall protection system*
> from DFP *that was installed* in one of the Edinburg Facility's corn silos in
> October 2013.
>
> *  *  *

22

16. On February 21, 2014, DFP presented Azteca with DFP's written proposal *for the design, manufacture, installation, and training of a custom-made fall protection system with two users per lifeline* (the "FPS 2") for Azteca's Edinburg Facility. See Exhibit 1 (DFP's Proposal Number 6558, dated February 21, 2014).

17. DFP's proposal for the Edinburg facility provided a 1-year warranty against *workmanship and product defects* of the FPS 2[.]

19. On August 5, 2014, DFP presented Azteca with DFP's written proposal *for the design, manufacture, installation, and training of the FPS 2* for Azteca's Plainview Facility. See Exhibit 3 (DFP's Proposal Number 6424-A, dated August 5, 2014).

20. Similar to DFP's Edinburg Facility proposal, DFP's proposal for the Plainview Facility provided a 1-year warranty against *workmanship and product defects* of the FPS 2[.]

\* \* \*

22. Within months of receiving Azteca's purchase orders, DFP informed Azteca it was able *to design a functioning FPS 2 system and presented Azteca with the final drawings* for this system. See Exhibit 5 (DFP's Final Design Drawing).

23. DFP's *drawings for the FPS 2 expressly warranted* that the fall protection system – whether at a static stand still or energized (in use) – would not cause "oil canning" or collapse to the silo:

## DESIGN NOTES:

1.  THIS SYSTEM IS DESIGN AS A RESTRAINT SYSTEM ONLY.

2.  THE SYSTEM IS DESIGNED FOR (2) USERS PER HORIZONTAL LIFELINE.

3.  AS THE MATERIAL EMPTIES FROM THE SILO, THE FALL PROTECTION SYSTEM, IN ITS STATIC CASE, WILL NOT CAUSE "OIL CANNING" TO THE SILO.

4.  IN THE EVENT THE FALL PROTECTION SYSTEM IS ENERGIZED, THE STRUT DESIGN WILL NOT CREATE THE FORCES THAT WOULD CAUSE "OIL CANNING" TO THE SILO. IN TURN, THE SYSTEM WILL NOT CAUSE CATASTROPHIC FAILURE OF THE SILO.

5.  DFP WILL RECORD THE ON-SITE TRAINING PROVIDED AT THE END OF THE INSTALL.

24. Azteca reviewed this FPS 2 design drawing and informed DFP that *if it functioned as DFP claimed, it would meet Azteca's needs.* The proposals, purchase orders, and FPS 2 *design drawings* memorialize in writing the agreement between Azteca and DFP with regards to the FPS 2.

> 25. Sometime thereafter, DFP began *manufacturing* the FPS 2 *for installation* in Azteca's corn silos at its Plainview Facility and Edinburg Facility.

(Doc. No. 11 at PageID# 257-59 (emphases added).)  After recounting the instances where the DFP items pulled loose from silo walls, Azteca went on to aver:

> 41. To date, DFP has yet to provide Azteca a functional FPS 2 and in the interim has caused significant damage to Azteca's corn silos in its failed attempts to do so.
>
> 42. Azteca has lost all confidence in DFP's ability to design and install a functioning FPS 2.
>
> 43. Azteca provided notice of DFP's breach of DFP's warranties through written correspondence on November 15, 2019. DFP acknowledged Azteca's notice on December 20, 2019 and denied liability.
>
> 44. DFP's defective equipment and failure to comply with its warranties has resulted in hundreds of thousands of dollars in direct and consequential damages including property damage, business interruption costs, and attorneys' fees. Azteca now seeks to recover these damages.

(*Id.* at PageID# 261.)

Count One of the Counterclaim stated that "Azteca and DFP entered into a valid and enforceable agreement by which DFP agreed to design, manufacture, deliver, and install the FPS 2 fit for Azteca's use in its corn silos."  (*Id.* at PageID# 262.)  Counts Two and Three expressly asserted that "DFP sold defective FPS 2 equipment to Azteca and was a 'seller' within the meaning of" the UCC.  (*Id.* at PageID# 262 & 264.)  Both of those counts were pled in the alternative under the Texas and Ohio versions of the UCC.  (*Id.*)

Azteca's pleading language does not support its argument that services predominate over goods.  The words "service" or "services" never appeared in the Answer or Counterclaim. Instead, the pleading contained numerous references to the design and installation of *equipment*, as well as accusations that the equipment did not work and damaged the silo walls.  Azteca admitted not only that the UCC applied but further that DFP was a "seller" under the UCC.

24

"'Seller' means a person who sells or contracts to sell goods."  Ohio Rev. Code § 1302.01(A)(4).

### e)      Azteca's Discovery Admissions

During discovery, Azteca admitted in an interrogatory answer that the UCC —

> defines 'seller' as 'a person who sells or contracts to sell goods.'  DFP sells
> custom-made fall protection equipment (i.e., a good) and contracted with
> Azteca to design, engineer, manufacture, and install thirty (30) custom-
> made fall protection systems.

(Doc. No. 27-6 at PageID# 1022.)  Azteca also admitted that it was a "buyer," and that what DFP

provided were "goods" as defined in the Ohio UCC.  (*Id.* at PageID# 1060.)

### f)      Azteca's Changed Position

Notwithstanding its pleading and discovery admissions, Azteca argued in motion papers

that general contract law – and not the UCC – controls.  (Doc. No. 32 at PageID# 1333.)

Azteca "may not expand [its] claims to assert new theories for the first time in response

to a summary judgment motion."  *Desparois v. Perrysburg Exempted Vill. Sch. Dist*., 455 F.

App'x 659, 666 (6th Cir. 2012) (citing *Bridgeport Music, Inc. v. WM Music Corp*., 508 F.3d 394,

400 (6th Cir. 2007)).  But even if the Court ignored Azteca's late change in position, the written

documents that together comprised the parties' contract show that the services were incidental to

Azteca's predominant objective, which was to acquire a specially manufactured good that Azteca

employees could use for fall protection.  *See generally Mueller v. All-Temp Refrig., Inc.*, 2014 -

Ohio- 2718, 2014 WL 2859170, at *8 (Ohio Ct. App. 3d Dist. 2014); *Mecanique*, 304 F. Supp.

2d at 977 ("The mere fact that a manufacturer utilizes its efforts and expertise in producing a

good does not mean that the buyer is purchasing those services instead of the good itself.").

Azteca referred to "engineering, designing, manufacturing, installation and training

services" by DFP.  (Doc. No. 32 at PageID# 1331.)  Of those five, the first four "services" are

really just facets of creating and delivering a "specially manufactured good," which the UCC

expressly brings within its reach.  *See* Ohio Rev. Code § 1302.01(A)(8).  Because "almost all contracts involving commercial goods include some aspect of services, the fact that the manufacturer uses their effort and expertise in producing the good does not necessarily mean that the buyer is purchasing a service."  *Allied Erecting*, 34 N.E.2d at 185-86; *see also Action Group*, 2013 WL 6708395 at *9; *Mecanique*, 304 F. Supp. 2d at 977.

Training is a service – yet context is crucial.  DFP's proposal revealed that it was not offering some broad-based consulting service or to educate Azteca personnel on a varied array of general subjects.  Rather, the written proposal indicated that training would cover why and how to use the specific equipment DFP manufactured and installed:

Training:

- Conducted on the last day of system installation

- Qualified and trained personnel provide training to clients personnel or their designated sub-contractors *using the system*

- Training documentation as required by OSHA regulation 1926.761(a)(b)

  - One hour classroom style training

  - Train on fall protection basics

  - Train on the actual use of the system installed

    - Receive (1) copy of instructional and maintenance records manuals

    - Receive (1) CD of instructional and maintenance records manuals

    - Receive (1) paper copy of "As-Built" drawings

    - Receive (1) CD copy of "As-Built" drawings

    - Receive (1) DVD copy of "Fall Protection Basics"

    - Receive (1) copy of training roster identifying individuals that have been *trained on the actual system*

(Doc. No. 32-1 at PageID# 1349 (emphases added).)  In sum, the training service was precipitated by installation of specially made goods.  The subject matter of the training covered the need for those goods (*i.e.*, fall protection basics) and how the goods addressed the need (*i.e.*, actual use of the system installed).

Azteca first suggested that "seventy-five percent (75%) of the agreed upon price is directly tied to services DFP agreed to provide[.]"  (*Id*. at PageID# 1332.)  This assertion is based on the payment schedule in the proposals:

- Progress Payments, Net 30 Days
    - 50% upon submission of engineering design for approval
    - 25% upon shipment of materials to installation site
    - 25% upon completion of installation and training

(Doc. No. 23-1 at PageID# 440.)  The term above refers to the timing of when payments would be due.  The term is not on its face indicative of how the price DFP quoted was allocated as between goods and services.  Moreover, Azteca did not cite extrinsic evidence showing that the parties mutually understood or agreed that 75% of the price would not be attributed to the specially made goods and instead was a form of service compensation.

Azteca thus has not shown services to be the predominant feature of the parties' contract.

### g)    DFP's Burden

DFP has carried its burden to show that the parties' contract was predominantly one for goods and thereby subject to the UCC.  First, DFP correctly noted that Azteca pled this contract and this dispute into the UCC's reach.  Second, the parties' references to OSHA show a need for safety equipment at the silos – not just safety training.  Third, the DFP proposals – written based on DFP's negotiations with Azteca – on their face reveal that goods were the predominant object of the deal.  Fourth, the proposals and cursory purchase orders together indicate that the parties

operated on an assumption that the UCC applied.  *See* Ohio Rev. Code §§ 1302.04(A) & 1302.07(A).

> **h)**     **Absence of a Dispute Over the Description of the Goods and Services**

The parties did not differ on which products or which services were included in the proposal.  There is consensus on the descriptive questions of what goods and services were "in" the deal.  "Here, though the parties dispute the 'predominant purpose' of the contract, there is no dispute regarding what goods and services were within the purview of the agreement.  Accordingly, the question of whether the transaction is governed by the UCC is a question of law for this Court."  *Duro Bag Mfg., Inc. v. Printing Servs. Co., Inc.*, No. 1:08-CV-842, 2010 WL 3586855, at *4 (S.D. Ohio Sept. 9, 2010).

DFP and Azteca debated the import and implications of the goods and services that were the subject of their agreement.  And they argued what conclusions should be drawn from what was prescribed in DFP's proposals and Azteca's purchase orders.  Those raise questions of law.

> The purpose of contract construction is to discover and effectuate the intent of the parties.  The intent of the parties is presumed to reside in the language they chose to use in their agreement.  Extrinsic evidence is admissible to ascertain the intent of the parties when the contract is unclear or ambiguous, or when circumstances surrounding the agreement give the plain language special meaning.

*Graham v. Drydock Coal Co.*, 667 N.E.2d 949, 952 (Ohio 1996) (quotations and citations omitted); *see also Skivolocki v. E. Ohio Gas Co.*, 313 N.E.2d 374, 375 (Ohio 1974); *Belville Mining Co. v. United States,* 999 F.2d 989, 993-94 (6th Cir. 1993).

Given this state of the record evidence and arguments, it is not necessary to submit the present question to a jury.  The parties "may disagree as to the conclusion the Court should reach, but there is no genuine dispute as to the facts regarding the purchase orders, acknowledgments and invoices between" them.  *Tekfor*, 2014 WL 5456525, at *5 (determining

as a matter of law on summary judgment motion whether transaction was primarily for goods or services).  For the reasons discussed above, the Court concludes as a matter of law the predominant purpose of the contract was for the sale of goods.  Article 2 of the UCC applies.

### C.  An Enforceable Contract Under the UCC

Both sides admitted that a valid, enforceable contract existed between them.  (*See* Doc. No. 1 at ¶ 19; Doc. No. 11 Answer at ¶ 11 and Counterclaim ¶ 47; Doc. No. 12 at ¶ 47; Doc. No. 23 at PageID# 422 & 428-29; Doc. No. 31 at PageID# 1268.)  Azteca wrote: "[t]he agreement between DFP and Azteca is memorialized in DFP's proposals, Design Drawings, and Azteca's subsequent purchase orders."  (Doc. No. 32 at PageID# 1322.)  "It is undisputed that Azteca expressly negotiated for DFP to design, manufacture, install and provide training for a custom-made fall protection system to be installed in Azteca's corn silos." (*Id.* at PageID# 1334.)  DFP likewise wrote: "There is no dispute that Azteca and DFP entered into an enforceable agreement as evidenced by" DFP's proposals and Azteca's purchase orders.  (Doc. No. 31 at PageID# 1268.)

The parties are correct.  *See Athens Bone & Joint Surgery, Inc. v. Mgmt. Consulting Grp., Inc.*, 2003-Ohio-2599, 2003 WL 21152871, at *4 (Ohio Ct. App. 4th Dist. 2003) ("Although there was not a written contract detailing the terms of the sale, the evidence offered to show that a contract existed included appellee's quote solicitation, appellant's price quote, and appellant's sales order packing slip.  The trial court found that a valid contract existed and that finding will not be disturbed on appeal.").  To facilitate the exchange of goods and to reduce transaction costs, the UCC does not require elaborate commercial instruments in order to bind a seller and buyer to their deal.  "A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract."

29

Ohio Rev. Code § 1302.07(A). Here, Azteca's purchase orders did not contain terms that differ or deviate from DFP's proposals. While the parties may differ in how the terms and conditions ought to be understood or enforced, there is no dispute over what terms and conditions existed in the written contract (*i.e.*, the accepted proposals).

The Court now reviews the merits of each party's claims. "The fact that both parties make motions for summary judgment, and each contends in support of his respective motion that no genuine issue of fact exists, does not require the Court to rule that no fact issue exists." *Begnaud v. White*, 170 F.2d 323, 327 (6th Cir. 1948). "It is true that both parties seek to resolve this case through the vehicle of cross-motions for summary judgment, but the standards upon which the court evaluates the motions for summary judgment do not change simply because the parties present cross-motions." *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991). "Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id.* (quoting *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987)).

The Court begins with Plaintiff's claims, on which Azteca moved for summary judgment.

### D. DFP's Promissory Estoppel Claim

Count Two of DFP's Complaint asserts a claim for promissory estoppel. Ohio has adopted the doctrine of promissory estoppel as set forth in section 90 of Restatement of the Law 2d Contracts (1981). *See generally Talley v. Teamsters Local No. 377*, 357 N.E.2d 44 (Ohio 1976). The Ohio Supreme Court has held that in the presence of an unambiguous written contract on the same subject matter, the parol evidence rule precludes the parties from invoking oral promises. *Ed Schory & Sons, Inc. v. Soc. Nat'l. Bank*, 662 N.E.2d 1074, 1080-81 (Ohio

1996); *see also Kashif v. Cent. State Univ.*, 729 N.E.2d 787, 791-92 (Ohio Ct. App. 10th Dist. 1999).  "Promissory estoppel does not apply to oral statements made prior to the written contract, where the contract covers the same subject matter."  *Borowski v. State Chem. Mfg. Co.*, 647 N.E.2d 230, 235 (Ohio Ct. App. 8th Dist. 1994); *accord Gallant v. Toledo Pub. Schools*, 616 N.E.2d 1156, 1161 (Ohio Ct. App. 6th Dist. 1992); *Lippert v. Univ. of Cincinnati*, No. 96API03-349, 1996 WL 566012, at *4 (Ohio Ct. App. 10th Dist. Oct. 3, 1996).

Here, DFP's promissory estoppel claim in Count Two covered the same terrain as its breach of contract claim in Count One.  *Cf. Int'l Periodical Distrib. v. Bizmart, Inc.*, 768 N.E.2d 1167, 1170 (Ohio 2002) (holding that Ohio's UCC provision applied in lieu of Ohio's comparable statute for general contracts).  It centered on Azteca's "promise to pay for the design, fabrication, installation and training services related to a custom-made fall protection system." (Doc. No. 1 at ¶ 24.)  That same payment obligation is the gravamen of the breach of contract claim.  (*See id.* at ¶¶ 16-17 & 19-22.)

Because the parties agreed that they had an enforceable contract comprised of the written proposals and purchase orders, the law does not support an overlapping promissory estoppel claim.  "Promissory estoppel is not a doctrine designed to give a party to a negotiated commercial bargain a second bite at the apple in the event it fails to prove breach of contract." *Gen. Aviation, Inc. v. Cessna Aircraft Co.*, 915 F.2d 1038, 1042 (6th Cir. 1990) (quoting *Walker v. KFC Corp.*, 728 F.2d 1215, 1220 (9th Cir. 1984)).

To the extent that DFP meant to use the promissory estoppel claim to depart from the language of its written proposals Azteca accepted, that effort is foreclosed as a matter of law.  A "plaintiff cannot invoke the doctrine of promissory estoppel on the basis of alleged promises that contradict [a] written contract."  *Kashif*, 729 N.E.2d at 791; *see also Lippert*, 1996 WL 566012,

31

*4 ("While this court allows promissory estoppel claims to be argued alternatively to breach of contract claims . . . the oral agreement on which the promissory estoppel claim is based cannot be used to alter the unambiguous written contract." (internal citation omitted)).

Accordingly, Azteca's motion for summary judgment on Count Two of the Complaint is granted.

### E. DFP's Unjust Enrichment Claim

Count Three of the Complaint alleges unjust enrichment on the theory that DFP provided (yet Azteca did not pay in full for) "the design, fabrication, installation and training services regarding the custom-made fall protection system."  (Doc. No. 1 at PageID# 5.)  Ohio courts describe unjust enrichment as "quasi-contract."  *Hambleton v. R.G. Barry Corp.*, 465 N.E.2d 1298, 1302 (Ohio 1984) (quoting *Hummel v. Hummel*, 14 N.E.2d 923 (Ohio 1938)).

"Under Ohio law, there are three elements for a quasi-contract claim.  There must be: (1) a benefit conferred by the plaintiff upon the defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment."  *Reisenfeld & Co. v. Network Group, Inc.*, 277 F.3d 856, 860 (6th Cir. 2002).  "Ohio courts use the phrase 'unjust enrichment' to describe the third requirement for 'quasi-contract.'"  *Id.* at 862 n.1.  For quasi-contract or unjust enrichment, "the purpose of such claims is not to compensate the plaintiff for any loss or damage suffered by him but to compensate him for the benefit he has conferred on the defendant."  *Johnson v. Microsoft Corp.*, 834 N.E.2d 791, 799 (Ohio 2005) (quotation omitted).

Quasi-contractual relief is not available here for two independent reasons.  First, the enforceable contract will determine the monetary remedies, if any, to which DFP may be entitled.  Second, the undisputed facts along with DFP's arguments and admissions together

reveal no actionable benefit bestowed on Azteca.

The Sixth Circuit has construed Ohio law to rule out quasi-contract claims where the same subject matter is covered by an enforceable contract.

> We find no prejudicial error in the district court's dismissal of the two counts claiming unjust enrichment or quasi-contract.  Ohio permits no recovery on such theories where, as here, an express contract cover(s) the same subject, . . . [Plaintiff's] unjust enrichment, or quasi-contract, theories are no broader than his contract theory . . . . The contract theory then being just as 'adequate' as the unjust enrichment, or quasi-contract, theories, founded in equitable principles, the unjust enrichment, or quasi-contract, theories are unavailable.

*Randolph v. New England Mut. Life Ins. Co.*, 526 F.2d 1383, 1387 (6th Cir. 1975) (quotations and citations omitted); *see also Everett v. Verizon Wireless, Inc.*, 460 F.3d 818, 825 (6th Cir. 2006) ("[T]o the extent the company means to argue that plaintiffs sought relief under their unjust enrichment claims in addition to the relief available under their contractual claims, no such relief is available under Ohio law.").  Thus, "courts in Ohio have held that one may not recover for unjust enrichment where an express contract between the parties covers the same subject as the claim of unjust enrichment."  *Ret. Ctrs. of Am., Inc. v. St. Leonard Ctr., Inc*., No. C-3-90-343, 1992 WL 1258517, at *9 (S.D. Ohio July 8, 1992) (collecting authorities).  "When a plaintiff has alleged the existence of a contract, that contract—not common law causes of action—provides her exclusive remedy.  . . .  Ohio law does not permit recovery in equity where a contract provided the plaintiff with a remedy."  *Young v. Carrier Corp.*, No. 4:14-CV-0974, 2014 WL 6617650, at *7 (N.D. Ohio Nov. 21, 2014).

It was permissible for DFP to plead Count Three in the alternative, when the existence or enforceability of a contract of sale were open to challenge.  But now both sides have admitted that the parties formed an enforceable contract of sale.  "A party to a contract cannot seek damages under the equitable theory of unjust enrichment when an express or implied contract

33

covers the subject matter of that claim." *Ankle & Foot Care Ctrs. v. InfoCure Sys., Inc*., 164 F. Supp. 2d 953, 961 (N.D. Ohio 2001).

For these reasons, Azteca's motion for summary judgment on Count Three of the Complaint is granted.

### F. DFP's Breach of Contract Claim

In Count One of the Complaint, DFP alleged that Azteca breached the parties' agreement: "As of the filing of this Complaint, Azteca has failed to satisfy its payment obligation to DFP, and a balance of $107,367.32 is due and owing for materials, freight, and labor costs associated with the design, fabrication, installation, and training of the custom-made fall protection system." (Doc. No. 1 at ¶ 17.)

"Under Ohio law, the elements of a breach of contract claim are: (1) the existence of a contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damage or loss to the plaintiff as a result of the breach." *V & M Star Steel v. Centimark Corp*., 678 F.3d 459, 465 (6th Cir. 2012); *cf. Thornton v. Dutch Nats. Processing, LLC*, No. 3:20-CV-00159, 2022 WL 4359066, at *5 (M.D. Tenn. Sept. 20, 2022) ("The elements of a breach-of-contract claim are not altered by the UCC.").

### 1. The Parties' Contentions

Azteca acknowledged that an enforceable contract existed. (Doc. No. 23 at PageID# 429; *see also* Doc. No. 31 at PageID# 1268 ("There is no dispute that Azteca and DFP entered into an enforceable agreement as evidenced by Proposal 6558 and the Edinburg P.O.").) Azteca moved for summary judgment principally on the ground that "DFP never performed its obligation under the contract[.]" (Doc. No. 23 at PageID# 427-28.)

> DFP only installed eighteen (18) of twenty-four (24) systems at Azteca's Edinburg location. In addition, after the FPS 2 systems failed by tearing loose from the corn silo walls in October, 2015, DFP removed *all* the FPS

> 2 systems and brought them back to Ohio for testing.  Despite multiple
> efforts by DFP, DFP was unable to ever manufacture a working and
> successful FPS 2 system at Azteca's facilities, which prevented DFP from
> ever completing installation at Edinburg.  Therefore, under the terms of the
> contract, DFP did not fully and faithfully perform its contractual obligations
> *as required to establish its breach of contract claim.*

(*Id.* at PageID# 428 (emphasis in original) (record citations omitted).)

DFP does not contradict these factual assertions.  Instead, DFP pointed to purported open questions of fact that it suggested should defeat summary judgment: namely whether DFP substantially or fully performed and, if not, whether the nonperformance was excused.  (Doc. No. 31 at PageID# 1268-69.)

Azteca replied: "Despite DFP's multiple attempts at installation over a more than two (2) year period, DFP never completed installation in all twenty-four silos.  Not because Azteca obstructed DFP's performance or because of excessive heat conditions, but instead because the systems separated from the corn silo walls each time DFP attempted."  (Doc. No. 34 at PageID# 1416.)

Azteca's motion carried the movant's initial burden on Count One.  The exhibits referenced in Azteca's papers demonstrate that DFP cannot show its own performance under the contract, which is a required element.  *See Celotex*, 477 U.S. at 322-23.

### 2. Substantial Performance

DFP invoked the "substantial performance" doctrine from Ohio common law.  (*See* Doc. No. 31 at PageID# 1269-71.)  "'Where a plaintiff seeks to recover damages for breach of contract, the burden is upon [the plaintiff] to show either substantial performance or tender of performance of the conditions on [the plaintiff's] part to be performed.'"  *Lawless v. Bd. of Educ. of Lawrence Cnty. Educ. Serv. Ctr.*, 141 N.E.3d 267, 285 (Ohio Ct. App. 4th Dist. 2020) (quoting *Cashland Fin. Servs., Inc. v. Hoyt*, No. 12CA010232, 2013 WL 4542766, at *2 (Ohio

Ct. App. 9th Dist. 2013)).

> In the law of contracts, 'substantial performance' is [an] approximation of full performance such that the parties obtain, in the main, what the contract called for, although it is not complete and final performance in every particular.  A party is in substantial compliance with its promises when its deviations are nominal, trifling, technical, slight, and consistent with an honest effort to perform.  For the doctrine of substantial performance to apply, the unperformed duties must not destroy the value or purpose of the contract.  If facts are undisputed, whether a party's conduct constitutes substantial performance is a question of law for the court.

*Lawless*, 141 N.E.3d at 285-86 (quotations and citations omitted); *see also Ohio Farmers' Ins. Co. v. Cochran*, 135 N.E. 537, 539 (Ohio 1922) ("It is an old rule of law, as old as the law of contracts, that where one party has substantially performed his part of the contract, he may call upon the other party to perform his part of the contract; or, such party failing so to perform, he may sue for breach of contract."); *id.*  (syllabus by court) ("Merely nominal, trifling, or technical departures are not sufficient to breach the contract.").

### a)        Uncertain Application to the UCC

The present-day UCC has departed from old strictures like the "perfect tender" rule to create ways a seller can fix a problem with delivered goods and thereby fulfill its end of a bargain.  *See generally Abele v. Bayliner Marine Corp.*, 11 F. Supp. 2d 955, 960 (N.D. Ohio 1997) ("The purpose of an exclusive remedy by the seller to repair or replace the defective parts is to give the seller an opportunity to cure the defect: to make the goods conform while limiting risks by excluding direct and consequential damages).  Ohio has adopted the UCC regarding a seller's opportunity to "cure" in the event of non-conforming delivery.  Ohio Rev. Code § 1302.52; *see also Malkamaki v. Sea Ray Boats, Inc*., 411 F. Supp. 2d 737, 743 (N.D. Ohio 2005) (discussing what suffices to afford a seller the "reasonable opportunity" to cure or repair).

That raises questions of law.  DFP did not develop an argument showing that Ohio's common law doctrine of substantial performance even applies to a seller's performance on a sale

contract governed by the modern UCC.  The cases DFP cited are inapposite to the dispute at

hand, and they make no mention of sale contracts under the UCC.[6]  While Ohio does apply the

substantial performance doctrine to service or construction contracts, *e.g.*, *Ashley v. Henahan*, 47

N.E. 573, 575 (Ohio 1897), those are distinct from a sale of goods governed by the UCC.

At least one Ohio jurist cast doubt on the doctrine's applicability to contracts of sale.  *See*

*Danner v. Fraley,* No. 1242, 1980 WL 351092, at *6 (Ohio Ct. App. 4 Dist. 1980) (Grey, J.,

dissenting) ("Under the common-law doctrine of substantial performance, it is clear that Plaintiff

would be entitled to recover. . . .  Under the UCC Plaintiff could not recover. . . .  The common

law doctrine of substantial performance works against the very certainty which the UCC was

enacted to provide.").[7]  When the Ohio legislature wanted a UCC provision to incorporate a

substantiality consideration, that was made explicit in the statute.  *See, e.g.*, Ohio Rev. Code §

---

[6] The contract in *Atsco Holdings Corp. v. Air Tool Co.*, No. 1:15-cv-1586, 2017 U.S. Dist.
LEXIS 224626 (N.D. Ohio Dec. 20, 2017) was not for the sale of goods.  It was an asset
purchase agreement ("APA"), and the substantial performance question was whether email
sufficed for notice despite the APA's language directing that notice be via facsimile.  The
contract in *Stonehenge Land Co. v. Beazer Homes Invests., L.L.C.*, 893 N.E.2d 855, 858 (Ohio
Ct. App. 10th Dist. 2008) was for the purchase of multiple tracts of land.  Like *Atsco*, the
substantial performance issue in *Stonehenge* related to the form of contractual notice.  The court
there held that "a technical deviation from a contractual notice requirement will not bar the
action for breach of contract brought against a party that had actual notice."  *Id.* at 863.  Finally
in *Burlington Resources Oil & Gas Co. v. Cox*, 729 N.E.2d 398 (Ohio Ct. App. 4th Dist. 1999), a
lessee filed suit against a successor lessor, seeking declaratory judgment that the oil and gas lease
was not breached when it timely sent annual rent payment to original lessors, rather than its
successor.  *Id.* at 398-400.

[7] Although the parties did not cite it, the Ohio Supreme Court a century ago did hold: "A written
contract for the sale of several articles of personal property for a sum in gross is indivisible
except by subsequent agreement of the parties, and the seller cannot recover the contract price or
any part thereof *unless he substantially performs, or tenders performance of, all* the terms of the
contract on his part to be performed."  *Petersburg Fire Brick & Tile Co. v. Am. Clay Mach. Co*.,
106 N.E. 33 (Ohio 1914) (syllabus by court) (emphasis added).  However, that case preceded by
a half-century Ohio's adoption of Article 2 of the UCC.  *See* Ohio Rev. Code §§ 1302.01 to
1302.98.

1302.72.  Given the dearth of case law squarely addressing the issue, the Court has looked

outside Ohio for insight into how other jurisdictions view the doctrine where it intersects with

the UCC.[8]

By contrast, the doctrine appears viable in the UCC arena in Colorado, Illinois, and New

The highest courts of Maine, New Jersey, and Wyoming have held that the doctrine of

substantial performance does not apply to a contract for the sale of goods.  *See Larson v. Burton

Constr., Inc*., 421 P.3d 538, 547 (Wyo. 2018); *Pomerantz Paper Corp. v. New Cmty. Corp*., 25

A.3d 221, 231-32 (N.J. 2011); *Moulton Cavity & Mold, Inc. v. Lyn-Flex Indus., Inc*., 396 A.2d

1024, 1025 (Me. 1979).  A federal court once remarked that "the weight of authority is that the

doctrine of substantial performance does not apply to the sale of goods."  *D.P. Tech. Corp. v.

Sherwood Tool, Inc*., 751 F. Supp. 1038, 1043 (D. Conn. 1990).  But that court went on to apply

a variant of the rule on the rationale that "rejection of goods that have been specially

manufactured for an insubstantial delay where no damage is caused is arguably not in good

faith."  *Id*.; *see also Exp. Dev. Canada v. T. Keefe & Son, LLC*, No. CV095032894S, 2016 WL

8488125, at *9 n.4 (Conn. Super. Ct. Nov. 9, 2016).

By contrast, the doctrine appears viable in the UCC arena in Colorado, Illinois, and New

York.  *See Maxton Builders v. Lo Galbo*, 502 N.E.2d 184, 187-88 (N.Y. 1986); *Petersen v.

Hubschman Const. Co*., 389 N.E.2d 1154, 1160 (Ill. 1979); *Colorado Springs Live Stock Co. v.

Godding*, 29 P. 529, 529 (Colo. Ct. App. 1892).  And "[t]here is some disagreement between the

Courts of Appeals whether the doctrine of substantial performance is applicable to contract cases

involving the sale of goods and whether a pleading of full performance will, therefore, support

---

[8] There are other situations where courts consider factors such as good faith when applying
sections of the UCC, where the analysis can be akin to the substantial performance doctrine.
*See, e.g.*, Ohio Rev. Code § 1302.73.  The Court has not endeavored to catalog such
circumstances or cases.  DFP did not develop an argument of this type.

an issue of substantial performance." *Shaddock v. Storm King Window Co.*, 696 S.W.2d 271,

272 (Tex. Ct. App. 1985) (writ refused, no reversible error); *cf. Beck Steel, Inc. v. Am. Stair*

*Corp.*, 62 F.3d 396, at *3 (5th Cir. 1995) (citing *Texas Imports v. Allday*, 649 S.W.2d 730, 737

(Tex. Ct. App. 1983) (writ refused, no reversible error)); *Richardson v. Herbert*, 135 S.W. 628,

630-31 (Tex. Civ. App. 1911).

### b)    DFP's Assertion

DFP argued for the UCC's application and invoked this doctrine.  Yet DFP has not

supplied legal support for the suggestion that the substantial performance doctrine from Ohio's

common law of contracts applies to a contract of sale governed by the UCC.  *Cf. Bandy v. Fifth*

*Third Bank*, No. 1:08-CV-1064, 2011 WL 4463415, at *6 (N.D. Ohio Sept. 27, 2011) (declining

to apply a common law doctrine to a UCC limitations provision); *Northern Frozen Foods, Inc. v.*

*Farro*, 138 N.E.3d 1223, 1229 (Ohio Ct. App. 8th Dist. 2019) (same).

It was incumbent upon DFP to cite authority for the propositions of law on which its

position depends.[9]  Courts are not "required to construct legal arguments on plaintiffs' behalf."

*Grover v. BMW of N. America, LLC*, 581 F. Supp. 3d 930, 943 n.24 (N.D. Ohio 2022) (collecting

authorities).

DFP argued that the quantum of its performance and the materiality of what DFP failed

to do or deliver were open questions of fact that should preclude summary judgment.  (Doc. No.

31 at PageID# 1268-69.)  The Court does not deem those questions material, however.  DFP has

not shown, as a legal matter, that the substantial performance doctrine is available to a seller

---

[9] Substantial performance, though typically raised in a defensive posture by defendants in breach
of contract actions, is not a true affirmative defense that is required to be pled in order to be
preserved under Ohio law.  *See City of Oberlin v. Lorain Cnty. Joint Vocational Sch. Dist. Bd. of*
*Ed.*, 2019-Ohio-3977, 2019 WL 4752380, at *5 (Ohio Ct. App. 9th Dist. 2019) (citing *Sims v.*
*Anderson*, 38 N.E.3d 1123, 1130 (Ohio Ct. App. 4th Dist. 2015)).

whose obligations are governed by the UCC. *Cf. Reform Am. v. City of Detroit*, 37 F.4th 1138, 1156 n.6 (6th Cir. 2022) ("Neither dispute is material because neither affects the case's outcome."). DFP's substantial performance arguments do not warrant the denial of summary judgment.

Even assuming *arguendo* that Ohio's common law substantial performance doctrine may be invoked in the UCC Article 2 context, the undisputed facts show that the doctrine is unavailable here – notwithstanding DFP's honest, best efforts to make the equipment work for Azteca.[10]

"Substantial performance of a contract is interpreted to mean that mere nominal, trifling, or technical departures are not sufficient to break a contract, and that slight departures, omissions and inadvertencies should be disregarded." *Cleveland Neighborhood Health Servs., Inc. v. St. Clair Builders, Inc.*, 582 N.E.2d 640, 644 (Ohio App. 8th Dist. 1989), *cause dismissed sub nom.*, 553 N.E.2d 692 (Ohio 1990). "For the doctrine of substantial performance to apply, the part unperformed must not destroy the value or purpose of the contract." *Cincinnati Dev. III, LLC v. Cincinnati Terrace Plaza, LLC*, No. 22-3303/3367, 2023 WL 2487348, at *6 (6th Cir. Mar. 14, 2023) (quoting *Hansel v. Creative Concrete & Masonry Constr. Co.*, 772 N.E.2d 138, 141 (Ohio Ct. App. 10th Dist. 2002)); *see also Perkins v. Petrilli*, 2022-Ohio-2029, 2022 WL 2163543, * 5 (Ohio Ct. App. 7th Dist. 2022). "A party fails to substantially perform when its omissions are material to the essential duties it promised to perform." *Cad Cam, Inc. v. Adept Mfg. Corp.*, No.

---

[10] "Where there has been an honest effort by the contractor to perform, and not a willful omission, substantial performance is all that is required." *Ashley*, 47 N.E. at 574 (Ohio 1897) (syllabus by court). There is nothing in the record conveying any hint of willful bad acts or lack of good faith by either side. (*See* Doc. No. 32 at PageID# 1329 ("Despite DFP's best efforts . . . DFP was never able provide Azteca a functioning system . . . .").) Accordingly, the Court concludes that there was an honest effort by DFP to perform.

97-8031, 1999 WL 961374, at *1 (Ohio Ct. App. 2nd Dist. 1999) (citation omitted).  For

example, where a plaintiff performed two-thirds of its obligations or supplied some pieces of

equipment but not other material pieces, an Ohio court held that this was not substantial

performance.  *Steen Elec. v. Homes of Elegance, Inc*., 2004-Ohio-6275, 2004 WL 2674610, at *3

(Ohio Ct. App. 9th Dist. 2004) (citation omitted).

"When the facts presented are undisputed, whether they constitute a performance or a

breach of a written contract, is a question of law for the court."  *Luntz v. Stern*, 20 N.E.2d 241

(Ohio 1939) (syllabus by court).  This rule has been applied to questions of substantial

performance.  *See, e.g.*, *Kumar v. USA Insulation*, 127 N.E.3d 344, 348 (Ohio Ct. App. 11th

Dist. 2018).

Drawing all inferences in DFP's favor, Azteca did not receive functional fall-protection

equipment in the silos.  The facts at hand cannot be characterized as involving merely a nominal,

trifling, or technical departure from what DFP's proposals contemplated and promised.  Azteca

was denied the value and purpose of the parties' original bargain.  The Court concludes from the

undisputed facts that the substantial performance doctrine was not available to DFP here.

For the reasons above, the Court finds that there is no genuine dispute on a material

question of fact with regard to DFP's own performance.

### 3.    Excused Performance & Delays

DFP discussed facts related to corn silo fill levels, weather, and other reasons that

delayed the timing of installations.  DFP's arguments posited fact disputes as to why certain

installations were delayed or precluded.  (Doc. No. 31 at PageID# 1265-68.)[11]  Azteca also

_____

[11] In a prior order, the Court granted DFP's motion to exclude Azteca's argument that DFP's
Complaint was time-barred.  (Doc. No. 37.)

weighed in on these questions.  (*See* Doc. No. 34 and exhibits thereto.)  "Neither dispute is material because neither affects the case's outcome," *Reform Am.*, 37 F.4th at 1156 n.6, as explained below.

The Court is not making findings of fact on the timeliness of DFP's deliveries or installations of equipment.  The decisions in this opinion also do not turn on why the re-designs or re-installations of new equipment – to replace previously uninstalled defective equipment – took longer than expected.

Similarly misplaced is DFP's argument as to the reason its final attempt to redeploy a twice-revised version of the fall protection systems was delayed and eventually did not occur. (Doc. No. 31 at PageID# 1269.)  DFP urged that Azteca balked at paying more for "outside the scope" fees or paying the final lump sum installment, which DFP insisted upon before coming to Texas for a "third mobilization."  (*Id.*)  This Court does not hold that DFP's attempts and efforts in this regard – or its failure to come to Texas for a third mobilization – constituted a material breach by DFP.

Even if the Court assumes *arguendo* that Azteca would need to pay both of those sums before DFP would be required to travel for a third mobilization or to reinstall re-redesigned equipment – the same problem remains: DFP did not supply conforming goods in 2015.

The parties contracted in the year 2014 for DFP to supply fall protection equipment. (SF ¶¶ 13-17 & 21.)  DFP equipment failed in 2015.  (SF ¶ 38.)  The equipment was not properly or sufficiently welded to the silo walls, according to DFP's analysis and report.  (*See* Doc. No. 34-3 at PageID# 1450-52.)  According to DFP, which wrote to Azteca on February 17, 2016: "After analysis of the returned materials by Diversified Fall Protection and our Airgas Corporation Aluminum weld specialist we have concluded the following:  . . .  Rivet connection failures were

caused by improper installation. . . . Due to the irregular surface of the silo, not all wing sections deployed correctly, and this was not detected during installation." (*Id.* at PageID# 1454.)

Based on the undisputed facts above, the Court concludes as a matter of law that DFP's goods delivered and installed in 2015 failed to conform to the contract, in that, *inter alia*, the equipment did not stay securely affixed to the silo walls. *See* Ohio Rev. Code § 1302.60. Azteca had certain options at that point, *see id.*, as well as obligations if it wished a return of the purchase price, *id.* § 1302.65.

Because not all of the silos had been equipped on October 7, 2015, conceivably the parties could have proceeded on the understanding that DFP had tendered delivery of non-conforming goods, which Azteca could have rejected. In that case, a buyer may allow a seller to cure by replacing defective goods with conforming ones. *See* Ohio Rev. Code § 1302.52. But apparently Azteca did not reject the DFP equipment and demand return of what it paid. Instead, it demanded that DFP repair its silo and redesign equipment to be used in both Plainview and Edinburg. (*See* Doc. No. 11 at PageID# 260 ¶ 31.) The parties stipulated that instead of rejection, the parties considered the goods to be in violation of the one-year warranty. (SF ¶ 38.) "In turn, DFP requested that all systems be tagged out for inspection under the one-year limited warranty provided by DFP. By November 3, 2015, the custom-made fall protection systems were uninstalled and returned to DFP for inspection." (SF ¶¶ 38-39.)[12]

---

[12] Because not all of the silos had been equipped on October 7, 2015, conceivably the parties could have proceeded on the understanding that DFP's goods tendered were non-conforming and therefore rejected by Azteca. In that case, the buyer could allow a seller to cure by replacing the defective goods with conforming ones. *See* Ohio Rev. Code § 1302.52. Here, the parties stipulated that instead of rejection, the parties considered the goods to be in violation of the one-year warranty. (SF ¶ 38.)

Azteca DFP redesigned and tested equipment in 2016.  (SF ¶¶ 39-42.)  In January 2017, the redesigned equipment failed.  (SF ¶ 43.)  DFP went back to the drawing board again.  (SF ¶¶ 44-45.)  In September 2017, the twice-revised DFP equipment failed.  (SF ¶¶ 47-48.)  "By January 9, 2018, DFP had uninstalled all redesigned systems at Azteca."  (SF ¶ 49.)  On March 22, 2018, . . . DFP made another proposal to replace the system," to which Azteca gave the proverbial 'no thanks.'  (SF ¶ 51.)

DFP did not develop a legal argument – based on the pertinent sections of Ohio's UCC or caselaw construing those sections – that its goods conformed, that its performance sufficed, or that it was denied a reasonable opportunity to cure or to provide conforming replacement goods. Nor did DFP show that under the UCC Azteca's actions somehow excused the nonconformity of DFP's goods.

DFP did not show a legal right to demand payment in full of the contract price, nor did DFP specify which goods (original, warranty replacements, redesign, second redesign, *etc.*) that it delivered which conformed but for which DFP was not paid.  *See generally* Ohio Rev. Code § 1302.77.  DFP asserted, without evidence or clear explanation:

> Because DFP was unable to install all systems, Azteca believes that it is not required to pay the final 25% which would amount to approximately $61,000.00. [Doc. 23, p.12].  However, Azteca owes DFP $107,367.32, plus interest. [Doc. 1, ¶17.] Therefore, DFP has conferred additional benefits beyond the original contract price in the amount of $46,000.00.

(Doc. No. 31 at PageID# 1273.)  DFP cited to its own complaint for the $107,367.32 purported balance figure, as well as argument in Azteca's brief for the $61,000 figure.  None of that is evidence.

DFP failed to show, with evidence and clear argument, exactly what goods or what

44

services DFP purported to be owed for that by law under the UCC it is entitled to collect.[13]  First, DFP did not show that the goods it delivered and installed in 2015 conformed to the contract. Those goods failed in the first year, *i.e.*, within the warranty period.  Second, DFP did not show that the goods it delivered in 2016 and 2017 to replace the original equipment conformed to the contract.  Rather, DFP stipulated that its replacement goods failed in the same basic manner as the original equipment, *i.e.*, by detaching from silo walls.  (*See* SF ¶¶ 38, 43, 48 & 51.)  In sum, DFP has not shown its own performance or its legal entitlement to monies from Azteca on the parties' contract.

For the reasons above, the Court grants summary judgment in favor of Azteca on Count One of the Complaint.

### G.  Azteca's Counterclaims

Azteca filed counterclaims asserting breach of contract, breach of express warranty, breach of implied warranty, money had and received, and promissory estoppel.  (Doc. No. 11 at PageID# 256-65.)  Below the Court summarizes the facts as Azteca pled or stipulated.

In July and August 2014, Azteca issued purchase orders accepting DFP proposals to install equipment at silos in Plainview and Edinburg.  (*See* SF ¶¶ 13-16.)  Azteca filed copies of the DFP proposals that were accepted.  (*See* Doc. No. 23-1 at PageID# 436-41 & 446-51; Doc. No. 32-1 at PageID# 1348-53 & 1357-62.)

Between February 2 and February 8, 2015, DFP installed custom-made fall protection

---

[13] For example, the written contract provided for payment of "25% upon completion of installation and training."  DFP argued that Azteca failed to pay 25% final installment payment(s) related to Edinburg.  (Doc. No. 31 at PageID# 1273.)  But DFP stipulated that eight silos at Edinburg (*i.e.*, 8 out of the 24 total silos under contract) were *not* installed and equipped as of September 1, 2015.  (SF ¶¶ 32 & 34.)  That means 33% of the Edinburg equipment had not been installed with DFP's original equipment.  So DFP has not shown Azteca to have breached owed DFP any money.

systems in all the silos at Plainview and conducted employee training.  (SF ¶ 25.)  Between June

29 and September 1, 2015, DFP installed systems in sixteen (16) silos at Edinburg (*i.e.*, out of 24

total silos) and conducted employee training.  (SF ¶¶ 32-34.)  Azteca admitted in discovery that

it "took possession" of fall-protection systems at both Plainview and Edinburg in 2015 and "had

a reasonable opportunity to inspect [those] after taking possession of the equipment."  (Doc. No.

27-6 at PageID# 1065-66.)

Azteca admitted that, in the parties' contract, "DFP provided a 1-year warranty against

workmanship and product defects."  (Doc. No. 11 at PageID# 258.)  Azteca specified the source

and content of DFP's express warranty as follows:

> DFP's proposal for the Edinburg facility provided a 1-year warranty against
> workmanship and product defects of the FPS 2:

**General:**
- DFP to provide complete fall protection liability coverage on all items noted above
- DFP will provide a 1 year warranty against workmanship and product defects. Does not apply to normal product wear components

> \* \* \*

> Similar to DFP's Edinburg Facility proposal, DFP's proposal for the
> Plainview Facility provided a 1-year warranty against workmanship and
> product defects of the FPS 2:

**General:**
- DFP to provide complete fall protection liability coverage on all items noted above
- DFP will provide a 1 year warranty against workmanship and product defects. Does not apply to normal product wear components

(*Id.* at ¶¶ 17 & 20 (highlighting in original).)

"On October 7, 2015, Azteca discovered one of the custom-made fall protection systems

separated from the silo wall in Edinburg and provided notice to DFP via email the same day.  In

turn, DFP requested that all systems be tagged out for inspection under the one-year limited

warranty provided by DFP."  (SF ¶ 38.)

> Within 24-hours . . . Azteca notified DFP of the failure and demanded immediate repair of the corn silo and reengineering of the FPS 2 installed at both the Edinburg and Plainview facilities. . . . Immediately after the FPS 2 Failure, Azteca ceased using the FPS 2 awaiting DFP's redesign.

(Doc. No. 11 at PageID# 260, ¶¶ 31 & 33.)  "By November 3, 2015, the custom-made fall protection systems were uninstalled and returned to DFP for inspection" (with the exception of a few silos for which the parties waited for corn levels to go down before removing the equipment).  (SF ¶ 39.)

"Soon thereafter, DFP began the redesign[.]"  (Doc. 11 at PageID# 260, ¶ 34.)  But each "improved version" failed in the same manner as had occurred on October 7, 2015.  (*Id.* at ¶¶ 35-41.)  Azteca described the subsequent failed equipment as "cured fall protection system."  (Doc. No. 32 at PageID# 1328.)[14]  "DFP never cured the failures and never provided Azteca with a working FPS system.  * * *  [The] equipment that failed on three (3) occasions . . . has never worked as represented and warranted by DFP."  (Doc. No. 27-6 at PageID# 1031-33.)

On November 15, 2019, after the parties' relationship had soured, Azteca's counsel sent a demand letter to DFP seeking the same species of damages as sought now in the Counterclaims.  (*See* Doc. No. 23-1 at PageID# 484-85.)  That letter invoked no implied warranty or any express warranty other than "Diversified's '1 year warranty' provided in the Proposal" No. 6558 dated

---

[14] Azteca's verbiage carries a particular connotation under Article 2 of the UCC.  "Where any tender or delivery by the seller is rejected because non-conforming and the time for performance has not yet expired, the seller may seasonably notify the buyer of his intention *to cure* and may then within the contract time make a conforming delivery."  Ohio Rev. Code § 1302.52(A) (emphasis added); *see also Gen. Motors Acceptance Corp. v. Grady*, 501 N.E.2d 68, 69 (Ohio Ct. App. 9th Dist. 1985) (syllabus by court) ("[W]here the buyer rejects a nonconforming tender, the seller has a 'reasonable time' to 'cure' the defects.").  "The buyer may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its value to him if he has accepted it . . . on the reasonable assumption that its non-conformity would be *cured* and it has not been seasonably *cured*."  Ohio Rev. Code § 1302.66(A)(1) (emphases added); *cf. Creative Extruded Prods., Inc. v. Amity Mold Co.*, 902 N.E.2d 531, 533 (Ohio Ct. App. 2d Dist. 2008) (discussing a seller's right to cure defective goods).

February 21, 2014.  (*See id.*)

DFP filed this action on February 18, 2020.  (SF ¶ 54.)  On April 21, 2020, Azteca filed

suit in a Texas state court asserting matters now contained in the Counterclaims in this action.

(SF ¶ 55.)  On February 25, 2021, Azteca filed its Answer and Counterclaims.  (Doc. No. 11.)

> Azteca seeks recovery of direct and consequential damages including, but
> not limited to contract damages, costs of repair, and business interruption
> costs. Specifically, Azteca seeks recovery of direct damages in the amount
> of $213,978.86, which is the $121,996.67 it paid to DFP for the defective
> FPS systems for its Edinburg, Texas facility and $91,982.19 paid to DFP
> for defective FPS systems for Plainview, Texas facility.  In addition, Azteca
> is seeking recovery of the $156,417.62 for repairs to Azteca's corn silos that
> resulted due to the failure of the FPS systems at its Edinburg and Plainview
> facilities.  In addition to these direct damages, Azteca is seeking recovery
> of business interruption costs that resulted due to the failure of the FPSFPS
> [*sic*] systems at its Edinburg and Plainview facilities.

(Doc. No. 27-6 at PageID# 1015; *see also id.* at PageID# 1032 (seeking "the return of its

$213,978.86" previously paid.)

### H.  Application of the UCC Statute of Limitations

DFP contended that all the Counterclaims were untimely because they were not filed by

October 7, 2019, *i.e.*, the four-year anniversary of the original equipment failure.  (Doc. No. 27 at

PageID# 969-71.)  "For purposes of applying the applicable statute of limitations, the cause of

action is determined not from the language or the form of the complaint or other pleading or

procedure, but from the gist (essential ground or object) of the complaint."  *Hibbett v. City of*

*Cincinnati*, 446 N.E.2d 832, 834 (Ohio Ct. App. 1st Dist. 1982) (syllabus by court); *see also*

*Palm Beach Co. v. Dun & Bradstreet, Inc.*, 665 N.E.2d 718, 722 (Ohio Ct. App. 1st Dist. 1995).

"An action for breach of any contract for sale must be commenced within four years after

the cause of action has accrued."  Ohio Rev. Code § 1302.98(A).  "For contract claims, . . . a

breach of contract action accrues when the breach occurs or when the complaining party suffers

actual damages as a result of the breach."  *Lutz v. Chesapeake Appalachia, L.L.C.*, 717 F.3d 459,

48

473 (6th Cir. 2013). But where a contract is for the sale of goods, the UCC contains an even more precise rule:

> A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance, the cause of action accrues when the breach is or should have been discovered.

Ohio Rev. Code § 1302.98(B). Other than the exception in the second sentence of Section 1302.98(B), "there is no discovery rule or some other tolling doctrine applicable to the statute of limitations for breach of contract for the sale of goods." *Foster v. Wells Fargo Fin. Ohio, Inc.*, 960 N.E.2d 1022, 1025 (Ohio Ct. App. 8th Dist. 2011); *see also Lutz*, 717 F.3d at 471 (collecting authorities).

This four-year limitations period governs Azteca's counterclaims, which were plainly predicated on a contract of sale. *See generally Val Decker Packing Co. v. Corn Prod. Sales Co.*, 411 F.2d 850, 854 (6th Cir. 1969); *Proctor & Schwartz, Inc. v. U. S. Equip. Co.*, 624 F.2d 771, 773 n.2 (6th Cir. 1980) (applying Michigan's version of UCC § 2-725, which was the same in material respects as Ohio Rev. Code § 1302.98); *U.S. Fid. & Guar. Co. v. Truck & Concrete Equip. Co.*, 257 N.E.2d 380, 383 (Ohio 1970); *Lee v. Wright Tool & Forge Co.*, 356 N.E.2d 303, 306 (Ohio Ct. App. 9th Dist. 1975); *Prokasy v. Pearle Vision Ctr.*, 499 N.E.2d 387, 389 (Ohio Ct. App. 8th Dist. 1985). Azteca pled that it "historically purchases safety equipment, including safety equipment for its silos, from various vendors." (Doc. No. 11 at PageID# 257, ¶ 9.) And Azteca explicitly admitted that DFP was a seller within the meaning of the UCC. (*Id.* at PageID# 262-64, ¶¶ 53 & 60.) "Revised Code Chapter 1302, which is Ohio's codification of the UCC, applies to all transactions in goods, including specially manufactured goods." *AirBorn Elecs., Inc. v. Magnum Energy Sols., LLC*, 82 N.E.3d 504, 509 (Ohio Ct. App. 9th Dist. 2017).

49

Because the Counterclaims are subject to the limitations period in Section 1302.98(A), the timeliness of each count turns mainly on when that four-year period started running under Section 1302.98(B).  *See generally Pinnacle Bank v. Fid. & Deposit Co. of Maryland*, 598 F. Supp. 3d 666, 673 n.6 (M.D. Tenn. 2022) (discussing accrual of a cause of action and the commencement of a limitations period).

### 1.    Tender of Delivery

Because these were complex "systems requiring assembly and installation by DFP's certified installers, it is Azteca's position that delivery could not possibly occur until DFP completed installation and training of those systems."  (Doc. No. 32 at PageID# 1334.)  The Court agrees with Azteca's basic point: the date of tender of delivery would be the date of installation – not the date equipment pieces were shipped from Ohio to Texas.  *See Val Decker Packing*, 411 F.2d at 851; *cf. Westfield Ins. Co. v. HULS Am., Inc*., 714 N.E.2d 934, 946 (1998); *Huron Tool & Eng'g Co. v. Precision Consulting Servs., Inc*., 532 N.W.2d 541, 547 (Mich. Ct. App. 1995).

But the Court does not agree with Azteca's suggestion in its brief that somehow no tender of delivery had ever occurred at all because not every silo at Edinburg was originally installed. (*See* Doc. No. 32 at PageID# 1334.)  First, Azteca stipulated that installation occurred, followed by employee trainings.  "Between February 2, 2015 and February 8, 2015, DFP mobilized, installed, and conducted training on the custom-made fall protection systems" at Plainview.  (SF ¶ 25; *see also* SF ¶¶ 15-16.)  "Between June 29, 2015 and July 1, 2015, DFP mobilized, installed, and conducted training on the custom-made fall protection systems in four (4) silos" and "[b]etween August 25, 2015 and September 1, 2015, DFP mobilized, installed, and conducted training on the custom-made fall protection systems in twelve (12) corn silos" at Edinburg.  (*See* SF ¶¶ 30, 32 & 34.)

50

Second, this suggestion is contrary to the facts and admissions on record.  For example, Azteca admitted that it took possession of and had a reasonable opportunity to inspect the equipment for both Plainview and Edinburg.  (Doc. No. 27-6 at PageID# 1065-66.)  The natural inference to be drawn from this allegation is that tender of delivery had occurred.  *See generally* Ohio Rev. Code § 1302.57(A) ("where goods are tendered or delivered . . . the buyer has a right before payment or acceptance to inspect them").  Moreover, Azteca pled and admitted that "[b]y February 23, 2015, DFP had completed installation and training of the FPS 2 at Azteca's Plainview Facility" and "[b]y October 7, 2015, DFP had installed the FPS 2 in 18 of the Edinburg Facility's 24 corn silos."  (Doc. No. 11 at PageID# 260, ¶¶ 26 & 29.)  Further, Azteca pled and admitted that it "paid $91,982.19 to DFP for the design, manufacture, delivery, installation, and training . . . for the Plainview Facility," and "Azteca paid $121,996.67 to DFP for the design, manufacture, delivery, installation, and training . . . for 18 of the 24 corn silos at the Edinburg Facility."  (Doc. No. 11 at PageID# 260, ¶¶ 27 & 32.)  These pled facts implicitly acknowledged that delivery and installation had occurred at Plainview and for most of the silos at Edinburg.  Finally, Azteca pled that after the October 7, 2015 incident, Azteca "ceased using" DFP equipment.  (*Id.* at ¶ 33.)  This would be impossible if DFP never delivered and installed such equipment in the first place.

Third, Azteca's counsel sent a demand letter to DFP, which Azteca filed as an exhibit in its summary judgment papers in this Court, in which Azteca asserted as fact:

> Diversified completed installation of the FPS 2 at Azteca's Plainview facility by February 2015, and at Azteca's Edinburg facility by July 1, 2015. Approximately eight (8) months after installation at Plainview and three (3) months after installation at Edinburg, the FPS 2 failed.

(Doc. No. 23-1 at PageID# 484.)  Azteca authenticated this demand letter and affirmatively relied on it.  (Doc. No. 23 at PageID# 426 n.19.)  *Cf. Oak Rubber Co. v. Bank One, N.A.*, 214 F. Supp. 2d 820, 833 (N.D. Ohio 2002) (considering a UCC demand letter on summary judgment).

Even if the equipment installed suffered from a design defect, that does not stop the UCC limitations period from commencing.  "Tender of delivery, as used in § 2-725 [codified as Ohio Rev. Code § 1302.98], refers to an offer of goods under a contract as if in fulfillment of its conditions, even though there is a defect when measured against the contract obligation.  To hold that nonconformity prevents tender of delivery would produce a strange situation: The statute of limitations would never begin to run until the seller cured the defect."  2 THE LAW OF PROD. WARRANTIES § 11:2.  "Conforming goods do not need to be tendered before the statute begins to run since that would be tantamount to delaying accrual indefinitely because a defect at delivery would prevent the start of the limitation period until it was corrected."  81 OHIO JUR. 3D SALES AND EXCHANGES OF PERSONAL PROPERTY § 248; *see also Standard All. Indus., Inc. v. Black Clawson Co.*, 587 F.2d 813, 819 (6th Cir. 1978) ("A contrary interpretation would extend the statute of limitations indefinitely into the future since a defect at the time of delivery would prevent proper 'due tender' from taking place until it was corrected.  Under section 2-725 [codified as Ohio Rev. Code § 1302.98], a cause of action accrues upon initial installation of the product regardless whether it functions properly or not . . . .").

In *Bliss v. Marcus's Fieldbrook, Inc.*, the buyers purchased a house on November 10, 1995, and pled that they "provided notice to [the sellers] of the defects in their home within one year after its delivery, but [the sellers] have not repaired the same."  2003-Ohio-900, 2003 WL 559406, at *2 (Ohio Ct. App. 2d Dist. 2003).  Citing Section 1302.98, the court held that the buyers "would have needed to file their complaint by . . . November 10, 2000 on the . . . breach

of warranty" claim.  *Id.*

There is no genuine question and the Court therefore finds that the following facts are not genuinely disputed.  First, DFP's original equipment was delivered to both Plainview and Edinburg by 2015.[15]  (*See* SF ¶¶ 23 & 30.)  Second, Azteca accepted the original equipment from DFP, which by September 2015 had been installed in all silos at Plainview and in the majority of silos at Edinburg.  (*See* SF ¶¶ 32 & 34; *see also* Doc. No. 23 at PageID# 426 n.19; Doc. No. 23-1 at PageID# 484.)

### 2.  Azteca's Breach of Contract Counterclaim

Count One of the Counterclaims provided:

> Azteca and DFP entered into a valid and enforceable agreement by which DFP agreed to design, manufacture, deliver, and install the FPS 2 fit for Azteca's use in its corn silos.  Azteca fully complied with the terms of the agreement by providing timely payment . . . .  DFP breached its obligation to Azteca by providing defective FPS 2 equipment.  The FPS 2 was not fit for use in Azteca's corn silos, nor did the FPS 2 meet Azteca's specifications.  DFP's breach caused damage to Azteca's corn silos.

(Doc. No. 11 at PageID# 262, ¶¶ 47-50.)  Specifically, DFP installed equipment that failed and caused damage to Azteca's silo on October 7, 2015.  (*Id.* at PageID# 260, ¶ 30.)[16]  By the next day, "Azteca notified DFP of the failure and demanded immediate repair of the corn silo and

---

[15] References to "original" equipment are used solely to make clear that the Court is not referring to DFP's subsequent cure efforts or to redesigned equipment.

[16] Azteca asserted during discovery that "DFP failed to fulfill its promise to Azteca when, on three occasions (October 2015, January 2017, and September 2017), the fall protection system failed by tearing loose from Azteca's corn silos."  (Doc. No. 27-6 at PageID# 1018-19.)  The later incidents in January 2017 and September 2017 did not involve the original equipment that DFP installed.  Rather, those incidents involved different equipment that had been redesigned at Azteca's demand following the October 2015 incident.  (*See* Doc. No. 11 at PageID# 260, ¶ 31.)  The events alleged to have occurred in 2016 and 2017 involved what Azteca referred to as "improved version" equipment, (*id.* at ¶¶ 35-39), the "cured fall protection system," and "new redesigned system."  (Doc. No. 32 at PageID# 1328-29.)  Those 2017 incidents will be addressed later in this opinion along with Azteca's claims for breach of warranty.

reengineering of the FPS 2 installed at both the Edinburg and Plainview facilities. . . . Immediately after the FPS 2 Failure, Azteca ceased using the FPS 2 awaiting DFP's redesign." (*Id.* at PageID# 260 ¶¶ 31 & 33.) "DFP uninstalled all of the systems in Azteca's Plainview and Edinburg, Texas facilities [and] shipped all of those systems back to Ohio . . . ." (Doc. No. 32 at PageID# 1328.) "By November 3, 2015, the custom-made fall protection systems were uninstalled and returned to DFP for inspection." (SF ¶ 39.)

"A claim for breach of contract is generally considered to accrue under Section 2-725(2) [codified as Ohio Rev. Code 1302.98(B)] when the seller delivers non-conforming goods to the buyer. In other words, Section 2-725(2) does not provide a discovery rule in which a claim does not accrue until the buyer knows or should have known of a defect in the goods." *Axios, Inc. v. Thinkware, Inc.*, No. 1:15-CV-379, 2015 WL 5029227, at *4 (S.D. Ohio Aug. 26, 2015) (citations omitted). The fact that a seller "allegedly promised but failed to remedy the defective [product] does not toll or extend the statute of limitations. This is particularly true where, as in this case, the buyer and seller are sophisticated business entities fully capable of protecting their own interests." *Id.* at *5 (citing *Adams v. Primax Window Co., Inc.*, No. CA99-01-004, 1999 WL 601021, at *3 (Ohio Ct. App. Aug. 9, 1999) ("[U]nder the law of Ohio, the statute of limitations for a UCC claim does not toll while an innocent purchaser relies on the seller's promise to repair.") and *Standard All. Ind.*, 587 F.2d at 821-22 (seller's promises to repair defective machine did not toll statute of limitations where parties were corporate entities "well able to look out for themselves")). In *Axios*, the seller made promises and attempts to rectify problems, which the court explained did not alter the accrual date for the buyer's claims:

> In any event, as already stated, [the buyer] admits that it knew the [product] was defective no later than August 2013. The fact that in December 2014 [the buyer] finally threw up its hands and quit working with [the seller] to

fix the problems does not equitably extend the accrual date of its claims because it knew more than a year earlier that the [product] was defective.

*Id.* at *5.

"Where a tender has been accepted . . . the buyer must within a reasonable time after he discovers . . . any breach notify the seller of breach or be barred from any remedy." Ohio Rev. Code § 1302.65(C)(1). Azteca's Counterclaim(s) for breach of the parties' sale contract and for failure of the goods to conform to what DFP had originally promised (*i.e.*, what DFP contracted to design and deliver) accrued by October 8, 2015 – the date when Azteca notified DFP of the prior day's incident and invoked its contractual warranty right to redesign. *See generally Wagner-Meinert*, 444 F. Supp. 2d at 803; *Hollingsworth v. The Software House, Inc.*, 513 N.E.2d 1372, 1377-78 (Ohio Ct. App. 1986); *Brunst v. Garner*, 122 N.E.2d 650, 652 (Ohio Ct. App. 8th Dist. 1952). A claim for damages to the silo from the equipment tearing away on October 7, 2015, also accrued by the following day. Ohio Rev. Code § 1302.98(B)(2). Further, Azteca pled and admitted that by October 8, 2015, it had immediately ceased use of DFP equipment. So the same accrual date applied to a claim for Azteca's inability to use the defective equipment while it awaited a redesign or replacement. *See id.* §§ 1302.88(C) & 1302.89(A). Thus, by October 8, 2015, DFP's purported breach of the contract of sale had occurred and the limitations period to file such a claim began running. *See id.* § 1302.98(B) ("A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach.").

This accrual date did not change based on Azteca's reaction or conduct. *See Envases Del Istmo, S.A. v. EaglePicher, Inc.*, No. 1:06-CV-107, 2006 WL 8463650, at *3 (S.D. Ohio May 8, 2006) ("[R]ejection or revocation of acceptance cannot be triggers to commence the statute of limitations on a claim for the breach of the agreement. . . . [I]t is clear that the statute of limitations does not commence with the buyer's assertion of a remedy, but rather with the

seller's breach of the agreement.").

Here Azteca did not cancel or revoke its prior acceptance of delivery upon discovery of DFP's breach by delivering defective goods (or by welding those goods to silos in a defective manner).  Rather, Azteca invoked a remedy that was contained in the contract.  *Cf. id.* at *4.[17] "Within 24-hours of the FPS 2 Failure," Azteca chose not to reject the goods or demand its money back.  (Doc. No. 11 at PageID# 260, ¶ 31.)  Instead, "Azteca notified DFP of the failure and demanded immediate repair of the corn silo and reengineering of the FPS 2 installed at both the Edinburg and Plainview facilities." (*Id.*)  *Cf.* Ohio Rev. Code §§ 1302.85(A) & 1302.90(A) (permitting a buyer to seek specific performance to secure delivery of "unique" goods).

As-yet uninstalled equipment for some silos at Edinburg did not change the accrual of Azteca's breach of contract claim.  If Azteca wished to sue for DFP's failure to install equipment for those Edinburg silos, that claim was known and had accrued before October 8, 2015.  *See generally Stephan's Mach. & Tool, Inc. v. D & H Mach. Consultants, Inc.*, 417 N.E.2d 579, 583 (Ohio Ct. App. 6th Dist. 1979) ("Failure of delivery of a machine supports a finding, by the trier of facts, in favor of the injured party awarding him damages for loss of property.").  Azteca could have sued by that date to cancel, rescind, or recoup a portion of the purchase price

---

[17] A buyer may revoke acceptance due to a non-conformity in goods that substantially impairs their value to the buyer.  Ohio Rev. Code § 1302.66(A).  That revocation becomes effective upon notice to the seller.  *Id.* § 1302.66(B).  "A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them."  *Id.* § 1302.66(C).  Then "with respect to any goods involved, and with respect to the whole if the breach goes to the whole contract . . . the buyer may cancel and whether or not he has done so may in addition to recovering so much of the price as has been paid[.]"  Ohio Rev. Code § 1302.85(A); *see also Ball Works, Inc. v. Lima Lawmower, Inc.*, No. L-96-237, 1997 WL 362464, at *5 (Ohio Ct. App. 6th  Dist. June 27, 1997); *cf. Koons v. Ozzy's Cash and Go Auto, LLC*, 176 N.E.3d 1115, 1119 (Ohio Ct. App. 4th Dist. 2021).  The distinction between breach of the seller's obligation versus a buyer's revocation is immaterial here as to timeliness, as both sorts of claims would have accrued by October 8, 2015.

previously paid that was attributable to equipment meant for those silos. *See Sears, Roebuck & Co. v. Suzuki of Cincinnati, Inc.*, C-76902, 1978 WL 216390, at *2 (Ohio App. 1st Dist. Apr. 19, 1978) ("R. C. 1302.65 reference to 'a non-conformity' or 'any breach' is applicable not only to defects in quality but also to breaches '. . .of any promise or warranty, as for instance, *delay in time*.'" (emphasis in original) (quoting *Eastern Air Lines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957, 972 (5th Cir. 1976))).

The Sixth Circuit has held that under Ohio law, it was incumbent upon Azteca at the time to give "notice with regards to 'any breach' and the same policies which support a rule requiring notice of breach when a latent defect is discovered also support a rule requiring notice of breach when performance *does not conform to time* . . . terms of the contract." *Roth Steel Prod. v. Sharon Steel Corp.*, 705 F.2d 134, 152 (6th Cir. 1983) (emphasis added); *see also Suzuki of Cincinnati*, 1978 WL 216390, at *2. Azteca could have chosen to declare breach, cancel, or demand reimbursement for the six unequipped silos. Instead, Azteca demanded a redesign of equipment for all silos at both locations – *i.e.*, including for the as-yet uninstalled silos at Edinburg.

Azteca next argued that May 31, 2017, should be deemed the date of delivery because that is when DFP shipped a "redesigned" system. (Doc. No. 32 at PageID# 1334-35.) But the parties stipulated that this system was done "[i]n order *to repair or replace* the custom-made fall protection system[.]" (SF ¶ 41 (emphasis added).) That occurred after Azteca admittedly "demanded immediate repair of the corn silo and reengineering of the FPS 2 installed at both the Edinburg and Plainview facilities." (Doc. No. 11 at PageID# 260, ¶ 31.) In other words, Azteca had already declared the original equipment defective and invoked its contractual rights under the one-year warranty. (*Id.*; SF ¶ 38.) That means DFP had already breached the original

contractual promise to supply working equipment.

> To require that "conforming goods" be tendered before the statute of limitations begins to run, as [Azteca] argues, would be tantamount to delaying the running indefinitely since a defect at delivery would prevent the start of the limitation period until it was corrected.  We reject such a construction of the statute.

*Allis-Chalmers Credit Corp. v. Herbolt*, 479 N.E.2d 293, 299 (Ohio Ct. App. 12th Dist. 1984) (citations omitted).

Finally, Azteca suggested that the law permits buyers and sellers to negotiate to extend liability into the future.  (Doc. No. 32 at PageID# 1334 (*citing Standard All. Ind.*, 587 F.2d at 820.)  This argument mixes and misapplies concepts.  To begin, Azteca argued that the redesigned replacement systems were made in conformity to redesign drawings approved in March 2017.  (Doc. No. 32 at PageID# 1334 (citing SF ¶¶ 45-46, 49).)  But there is nothing in the parties' stipulated facts or in those design drawings that expressly extends dates – either warranties or dates by which Azteca might sue.  Azteca thus failed to point the Court to evidence that in the Spring of 2017 the parties executed any warranty of future performance or a tolling agreement with regard to limitations.  Again, this occurred after DFP already breached the original contract and Azteca had invoked the warranty from the DFP proposals.

As for the case Azteca cited, it is of no help because the Sixth Circuit held that "under § 2-725(2) [codified at Ohio Rev. Code 1302.98(B)] the cause of action accrued when [Azteca] discovered or should have discovered that the [equipment] was defective, so long as the defect arose within the warranty period."  *Standard All. Ind.*, 587 F.2d at 821.  Here, the cause of action accrued on October 8, 2015, when a defect was discovered in the initial one-year warranty period, and Azteca invoked that warranty.  The Sixth Circuit expressly rejected the notion that the ticking clock on the limitations period triggered by the original product failure should be tolled or set back because much of the ensuing "limitations period was spent in attempted

58

repairs." *Id.* at 822.  The Sixth Circuit noted that the buyer had sufficient time remaining in the limitations period to sue for defective equipment even after the repair efforts.  *Id.*  That is true here.  The redesigned systems failed in 2017.  (SF ¶¶ 43 & 48.)  Azteca still had another two years in which to sue for breach of contract, the limitations period for which expired on October 8, 2019.

A breach of the sale contract claim on such bases was barred by the four-year limitations period as of October 8, 2019.  Ohio Rev. Code § 1302.98(A) & (B).  Azteca did not file suit in this Court (or another) prior to the expiration of that limitations period.  Afterward in 2020, DFP filed this action, which did not revive Azteca's expired claims.

DFP's motion for summary judgment on Count One of the Counterclaims is granted.

### 3.    Azteca's Quasi-Contractual Claims

DFP moved for summary judgment on the grounds that the promissory estoppel counterclaim (Count Four) was not cognizable apart from the UCC breach of contract counterclaim and was barred by the statute of limitations in Ohio Rev. Code § 1302.98.  (Doc. No. 27 at PageID# 970 n.4 & 974-75.)

In Count Four, Azteca pled that "DFP holds money that, in equity and good conscience, belongs to Azteca.  Azteca is entitled to recover this money from DFP, in an amount to be more fully demonstrated at trial."  (Doc. No. 11 at PageID# 265, ¶ 67.)  "The common law claim for money had and received is a quasi-contractual claim akin to unjust enrichment."  *Loyd v. Huntington Nat'l. Bank*, No. 1:08-CV-2301, 2009 WL 1767585, at *15 (N.D. Ohio 2009); *see also LRC Realty, Inc. v. B.E.B. Props.*, 166 N.E.3d 37, 41 (Ohio Ct. App. 11th Dist. 2020) (quoting *Nat'l. City Bank, Norwalk v. Stang*, 618 N.E.2d 241, 242 (Ohio Ct. App. 6th Dist. 1992)).

DFP moved for summary judgment on Count Five as well.  In Count Five, Azteca's

promissory estoppel counterclaim referred to exactly the same promise as was alleged in Count

One's breach of written contract counterclaim.  (*Compare* Doc. No. 11 at PageID # 262, ¶ 47

*with id.* at PageID# 265, ¶ 69.)

> a)      **Timeliness**

An Ohio court addressed a situation similar to here, where a party pled equitable claims

seeking the same sort of damages as it requested for breach of sale contract:

> In considering whether a cause of action is time-barred, courts must
> determine the true nature or subject matter of the acts giving rise to the
> complaint.  Courts must consider the essential character of a plaintiff's
> claim, rather than the form of the pleadings. . . . The party's creativity in
> pleading cannot be allowed to mask or change the fundamental nature of
> [the] causes of action.
>
> [Plaintiffs] alleged four causes of action in this case: breach of contract,
> unjust enrichment, promissory estoppel, and action on account.  Each of the
> claims is based on the same allegation: [Defendant] failed to accept delivery
> and pay for items it had agreed to purchase from its long-time supplier.
> Regardless of the creativity in pleading, *the fundamental nature of these
> claims is the same: breach of a sales contract.*

*Radio Parts Co. v. Invacare Corp.*, 897 N.E.2d 228, 234 (Ohio Ct. App. 9th Dist. 2008)

(emphases added; quotations and citations omitted).  "Promissory estoppel is not a doctrine

designed to give a party to a negotiated commercial bargain a second bite at the apple in the

event it fails to prove breach of contract."  *Gen. Aviation*, 915 F.2d at 1042.  The Sixth Circuit

has indicated that the UCC limitations period in § 1302.98 applies to a promissory estoppel claim

related to the sale of goods.  *GRW Indus. v. Gen. Motors Corp.*, 182 F.3d 917, 1999 WL 435161

at *4 (6th Cir. 1999).

When the money sought to be recovered was paid for goods governed by a sale contract,

the four-year limitations in Ohio Rev. Code § 1302.98 period applies.  *See generally O'Bryon v.

Poff*, 2003-Ohio-3405, 2003 WL 21487756, at *2 (Ohio Ct. App. 9th Dist. 2003); Ohio Rev.

Code § 2305.07(A) (excepting contracts of sale from the limitations period applicable to oral

contracts).  Counts Four and Five of Azteca's Counterclaims both are subject to the four-year period prescribed by Section 1302.98.

These causes of action do not enjoy the protections of the discovery rule.  *Med. Mut. of Ohio v. k. Amalia Enters. Inc.*, 548 F.3d 383, 393 n.6 (6th Cir. 2008); *Hahn v. Jennings*, No. 04AP–24, 2004 WL 2008474, at *7 (Ohio Ct. App. 10th Dist. Sept. 9, 2004) ("[W]e know of no case in which a tort-style discovery rule has been applied to a breach of express warranty action sounding in contract."); *Palm Beach Co.*, 665 N.E.2d at 722-23  (holding that discovery rule does not apply to unjust-enrichment claims).

As for the promissory estoppel claim, Azteca pled that DFP made "a clear and unambiguous promise to Azteca to design, manufacture, deliver, and install the FPS 2, a custom-made fall protection system . . . ."  (Doc. No. 11 at PageID# 265 ¶ 69.)  The equipment failed on October 7, 2015, and most of it was uninstalled and returned on November 3, 2015.  (SF ¶¶ 38-39.)  On December 12, 2015, a root cause analysis had been prepared and delivered to Azteca indicating problems with the manner in which DFP welded equipment to silos.  (SF ¶¶ 40-41; *see also* Doc 23-1 at PageID# 471-74.)  Under the UCC, a buyer like Azteca at that juncture had the right to declare the goods nonconforming, revoke acceptance, and request return of the purchase price paid to date.  *See* Ohio Rev. Code § 1302.66.  Even assuming a promissory estoppel claim was viable distinct from the UCC, such a claim accrued at the latest by December 15, 2015, when the equipment failed and a report indicated that DFP's welding (and/or design) was the root cause.

"In Ohio, an unjust enrichment claim does not accrue 'until the last point in time that the plaintiff conferred and a defendant unjustly received a benefit.'"  *Childers Redimix and Constr. Supply Inc. v. Concrete Plants, Inc.*, 5:21-CV-2150, 2022 WL 2666293, at *3 (N.D. Ohio July

11, 2022) (quoting *Starkey v. JPMorgan Chase Bank, NA*, 573 F. App'x 444, 449 (6th Cir. 2014)).  The last payment made by Azteca occurred on February 24, 2015.  (SF ¶ 29.)

The limitations period for Four and Five of the Counterclaims expired by end of 2019. Azteca did not sue by then, nor had this action been commenced by DFP.

### b)  Claims Subsumed by the UCC

Count Four would not be viable even if timely brought.  In this UCC Article 2 case, the Court reaches the same conclusion as was reached in Article 3 cases: claims for "money had and received are displaced by Ohio's codification of the UCC."  *Metz v. Unizan Bank*, No. 5:05-CV-1510, 2006 WL 8427066, at *11 (N.D. Ohio, 2006); *see also Olympic Title Ins. Co. v. Fifth Third Bank of Western Ohio*, 2004-Ohio-4795, 2004 WL 2009285, at *2-3 (Ohio Ct. App. 2d Dist. 2004); *Amzee Corp. v. Comerica Bank-Midwest*, 2002-Ohio-3084, 2002 WL 1012998, at *10 (Ohio Ct. App. 10th Dist. 2002); *Citizens Bank of Pa. v. Chevy Chase Bank*, No. 03-CV-5208, 2004 WL 875499, at *2 (E.D. Pa. 2004).  "Ohio law has folded the remedy of a sales contract rescission into the concept of 'revocation of acceptance.'"  *J.A. Indus., Inc. v. All Am. Plastics, Inc*., 726 N.E.2d 1066, 1070 (Ohio Ct. App. 3d Dist. 1999) (citation omitted).

Azteca's "recasting of its complaint as a cause of action to recover the purchase price . . . [is] unavailing.  The UCC makes clear that the recovery of the purchase price is also a buyer's remedy upon rejection or revocation of acceptance of non-conforming goods[.]"  *Envases Del Istmo*, 2006 WL 8463650, at *4 (applying *Aluminum Line Prod. Co. v. Rolls-Royce Motors, Inc*., 613 N.E.2d 990, 993 (Ohio 1993) (holding that a buyer's "request for rescission and the revocation of acceptance amounted to the same thing")).  "If recovery of the purchase price is a remedy for the seller's breach then, applying the logic of *Aluminum Line*, it cannot be a cause of action.  Again, the right to assert the remedy accrues with the cause of action, not the other way

around.  Therefore, in this case, [the buyer's] cause of action is one for breach of the sales

agreement, and not . . . recovery of the purchase price."  *Id.*

Similarly, even if timely pled, Count Five cannot coexist with Count One of the

Counterclaims.  Because Article 2 of the UCC addresses claims to recover a buyer's previously

paid purchase price, it displaced common law causes of action like promissory estoppel to the

same effect.  *See Young*, 2014 WL 6617650, at *7.

For the reasons above, DFP's motion for summary judgment on Counts Four and Five of

the Counterclaims is granted.

### 4. Azteca's Breach of Express Warranty Claim

"Express warranties under the Ohio Uniform Commercial Code (UCC) are contractual in

nature.  They arise only where a promise by the seller or a description of the goods to be sold is

made a part of the basis of the parties' bargain."  *Price Bros. Co. v. Phila. Gear Corp*., 649 F.2d

416, 422 (6th Cir. 1981).  "A cause of action accrues when the breach occurs, regardless of the

aggrieved party's lack of knowledge of the breach.  A breach of warranty occurs when tender of

delivery is made, except that where a warranty explicitly extends to future performance of the

goods and discovery of the breach must await the time of such performance, the cause of action

accrues when the breach is or should have been discovered."  Ohio Rev. Code § 1302.98(B).

"Even if a warranty extends to future performance, the limitations period starts to run when the

defect should have been discovered, such as when a machine first malfunctioned."  81 OHIO JUR.

3D SALES AND EXCHANGES OF PERSONAL PROPERTY § 248; *see also Miles v. Kohli & Kaliher

Assocs., Ltd*., 917 F.2d 235, 256 (6th Cir. 1990).  "The four-year statute of limitations set forth in

Ohio Rev. Code § 1302.98(A) applies to claims for property damage arising out of a transaction

for a sale of goods."  *Andersen Windows, Inc*., 913 F. Supp. 2d at 500.

Here, the express warranty invoked in Count Two comes from the DFP proposals, which

Azteca accepted.  (SF ¶¶ 5-6, 13-16, & 38.)  The warranty provided: "DFP will provide a 1 year warranty against workmanship and product defects.  Does not apply to normal product wear components."  (Doc. No. 11 at PageID# 258, ¶¶ 17 & 20.)  The Court need not decide whether this constituted a warranty of "future performance" within the meaning of Ohio Rev. Code § 1302.98(B).  Even assuming it was such a remedy, the parties stipulated that the equipment failed within the warranty period and was discovered by October 8, 2015.  (SF ¶ 38.)

This case is like *Advanced Prod. Ctr., Inc. v. Emco Maier Corp.*, 2003-Ohio-6206, 2003 WL 22746020 (Ohio Ct. App. 5 Dist. 2003).  A buyer "claimed that the purchase of the machines was induced by express warranties and representations made by [the seller] in the sales brochures.  [Buyer] asserted that the machines came with a twelve-month warranty and that within the warranty, [buyer] experienced problems with the machines.  [Buyer] claimed that [seller] attempted to fix the problems, but such attempts failed, breaching both the express warranty contained in the sales brochure, the express twelve-month warranty and the implied warranty of fitness."  *Id.* at *1.

> The first claim for breach of warranty was based upon representations in the sales brochure.  The warranty in the brochure does not explicitly extend to future performance, and the cause of action therefore accrues on delivery of the machines in January of 1996.  The statute of limitations expired in January of 2000, and the complaint was filed in November of 2000, well outside the four year statute of limitations.  [Buyer] claimed that the warranty was extended until November of 1999.  While [buyer] did not bring forth specific facts to support this claim, even if the warranty was extended to future performance, the statute of limitations would still begin to run on the date the breach was or should have been discovered.  The undisputed evidence shows that [buyer] discovered the breach of warranty in January of 1996, and the complaint would still be time-barred.

> As to the express twelve-month warranty, this warranty does specifically extend to future performance.  However, pursuant to the statute, the cause of action accrued when [buyer] discovered, or should have discovered the alleged breach, or when [buyer] first discovered that the machines malfunctioned.  The evidence is undisputed that the machines began to malfunction in January of 1996, and that at this time, [buyer] repeatedly

> advised [seller] of dissatisfaction with the machines.  The evidence
> demonstrated that [buyer] drafted various memos outlining the specific
> problems he found with the machines, and asking [seller] to fix the
> problems.  Therefore, the statute of limitations expired in January of 2000.
>
> [Buyer] argues that it did not discover the breach until November of 1999,
> when it learned that new parts were available to correct the problems.  The
> fact that [buyer] discovered in November of 1999 that new parts were
> available does not change the fact that in January of 1996, [buyer] was
> aware that the machines did not conform to the warranty that they would be
> free of defects for twelve months.
>
> As to the breach of implied warranty, again, the evidence is undisputed that
> [buyer] discovered the machines did not comply with the implied warranty
> of fitness in January of 1996, and thus the statute of limitations expired
> before the complaint was filed.

*Id.* at *2-3.  Notably, even though the court accepted the buyer's characterization of the one-year

warranty as extending to future performance, the equipment began to malfunction within the

warranty period.  The court therefore held that the limitations period on express and implied

warranty claims began running on that date of early malfunction.

Applying that reasoning here, Counts Two and Three of the Counterclaims were both

subject to a four-year limitations period that began on October 8, 2015 – when the equipment

malfunctioned within its first year, and Azteca notified DFP of the failure.  Also on October 8,

2015, Azteca demanded that DFP repair pursuant to the one-year warranty – just like the buyer

in *Emco* who complained and asked the seller to fix the machines.  *Emco* held that the limitations

period began running once the buyer invoked the warranty to address the malfunctioning

machines.

A similar approach was taken in *Primax Window Co*.

> In this case, the breach of warranty occurred when [buyers] discovered that
> their windows leaked air.  In his deposition, [buyer] stated that he had
> noticed a problem with the windows sometime during 1993, although he
> could not recall the exact date.  [Buyers] filed suit against Primax on
> January 2, 1998.  Because this action was filed more than four years after
> the breach of contract, it is barred by the statute of limitations.

65

[Buyers] urge this court to apply a "repair rule" to toll the statute of limitations. However, under the law of Ohio, the statute of limitations for a UCC claim does not toll while an innocent purchaser relies upon the seller's promises to repair.

*Id.* at *5.

For the reasons above, DFP's motion for summary judgment on Count Two of the Counterclaims is granted.[18]

### 5.     Azteca's Implied Warranty Counterclaim

Count Three of the Counterclaims seeks to recover for breach of the implied warranty of fitness for a particular purpose.[19] "To succeed on a breach of warranty claim, Ohio law requires the plaintiff to establish: "(1) the existence of a warranty; (2) the product failed to perform as warranted; (3) the plaintiff provided the defendant with reasonable notice of the defect; and (4) the plaintiff suffered an injury as a result of the defect." *Antero Res. Corp. v. Tejas Tubular Prods., Inc.*, 610 F. Supp. 3d 1047, 1062 (S.D. Ohio 2022). "To sufficiently state a claim for breach of implied warranty of fitness for a particular purpose, a plaintiff must allege that: (1) the seller has reason to know the buyer's particular purpose; (2) the seller has reason to know that the buyer is relying on the seller's skill or judgment to furnish appropriate goods; and (3) the buyer must, in fact, rely upon the seller's skill or judgment." *W.H.C., Inc. v. Interlake*

---

[18] The Court will address redesigned equipment delivered in 2016 and 2017 in a later section of this opinion.

[19] Azteca argued a contractual theory of implied warranty – not a tort theory. *See generally Bobb Forest Prod., Inc. v. Morbark Indus., Inc.*, 783 N.E.2d 560, 575 (Ohio Ct. App. 7th Dist. 2002) (noting the distinction and holding that a plaintiff's choice to invoke only the contractual approach precluded the court from considering a tort-style claim for breach of implied warranty); *White v. DePuy, Inc.*, 718 N.E.2d 450, 454 (Ohio Ct. App. 12th Dist. 1998) (describing Ohio law action for breach of implied warranty in tort).

*Chemicals, LTD*, 549 F. Supp. 3d 723, 729 (N.D. Ohio 2021) (quoting *Leen v. Wright Med.*

*Tech., Inc.*, No. 3:15-CV-125, 2015 WL 5545064, at *2 (S.D. Ohio Sept. 18, 2015)).

> A "particular purpose" differs from the ordinary purpose for which the goods are used in that it envisages a specific use by the buyer which is peculiar to the nature of his business whereas the ordinary purposes for which goods are used are those envisaged in the concept of merchantability and go to uses which are customarily made of the goods in question.  For example, shoes are generally used for the purpose of walking upon ordinary ground, but a seller may know that a particular pair was selected to be used for climbing mountains.

*Antero*, 610 F. Supp. 3d at 1064 (quoting Ohio Rev. Code § 1302.28 (official comment 2)).

### a)      No Elimination of the Implied Warranty

DFP argued that the parties' written agreement disclaimed the implied warranty, citing

Ohio Rev. Code § 1302.30(C).  (Doc. No. 27 at PageID# 973.)  But that statutory clause

expressly excepts the implied warranty that Azteca's Count Three invoked: "Express warranties

displace inconsistent implied warranties *other than* an implied warranty of fitness for a particular

purpose."  Ohio Rev. Code § 1302.30(C) (emphasis added); *see also HULS Am., Inc.,* 714

N.E.2d at 948.  Section 1302.30(C) is therefore of no effect as to Count Three, and an implied

warranty of fitness for a particular purpose was not displaced by the mere existence of written

warranties.

A distinct issue is whether, as DFP contended, the implied warranty of fitness was

expressly disclaimed in the parties' writings.  (Doc. No. 27 at PageID# 973.)  *See* Ohio Rev.

Code § 1302.29.  The Court does not reach that argument because Count III is time-barred, as

DFP also contended.  (Doc. No. 27 at PageID# 969-71.)  So for purposes of the discussion

below, the Court presumes *arguendo* that DFP's proposals had not explicitly eliminated the

implied warranty of fitness for a particular purpose.

**b)** **Timeliness**

"A breach of warranty occurs when tender of delivery is made, except . . . where a warranty explicitly extends to future performance . . . ."  Ohio Rev. Code § 1302.98(B).  "Implied warranties, by definition, cannot 'explicitly' extend to future performance.  Only a written, express warranty may do so."  *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co*., No. 1:02-CV-00013, 2005 WL 6778678, at *10 (N.D. Ohio Feb. 22, 2005) (citation omitted).  "Implied warranties, by definition, do not explicitly extend to future performance, thus removing any possibility that the discovery rule of Ohio Rev. Code § 1302.98(B) could toll the limitations period in this case."  *Andersen Windows, Inc*., 913 F. Supp. 2d at 505; *see also Grover v*, 581 F. Supp. 3d at 943 (N.D. Ohio 2022); *cf. Emco*, 2003 WL 22746020, at *3.

Here, delivery and installation occurred between January 23 and September 1, 2015.  (*See* SF ¶¶ 25, 32 & 34.)  So those would be the dates of accrual of implied warranty claims for that equipment.  More than four years passed from those dates before DFP or Azteca filed any claims, which means that the implied warranty claims were untimely.  *See* Ohio Rev. Code 1302.98.

Even if one looked to the date of discovery of the defect, Count Three still would be untimely.  *Cf. Primax Window Co.*, 1999 WL 601021, at *3 ("If a product fails within its warranty period, the limitations period should begin to run from the day the defect is or should have been discovered."); *Emco*, 2003 WL 22746020, at *3.  By October 8, 2015, DFP's equipment was separated, prompting Azteca to demand redesign and replacement *for all* of the silos.  By that date, Azteca had discovered that the equipment was not effective for Azteca's purpose, which meant that DFP violated an implied warranty of fitness for a particular purpose.  More than four years passed from that date before either party filed suit, and so the implied warranty claim is untimely.

For the reasons above, DFP's motion for summary judgment on Count III of the Counterclaims is granted.

## I.  Azteca's Waiver of the Post-Installation Manual Warranty

The parties stipulated that they executed "Project Sign-Off / Owner Acceptance" on February 8, July 1, and September 1, 2015. (SF ¶¶ 27, 33 & 36.)  Those forms followed three occasions in 2015 on which "DFP mobilized, installed, and conducted training on the custom-made fall protection systems."  (SF ¶¶ 25, 32 & 34.)  The sign-off forms provided in pertinent part:

> I understand that the warranty is a five-year limited warranty* on workmanship and components that begins from the date of training. . . .
>
> * see warranty in the Fall Protection System manuals (provided at time of training)

(Doc. No. 1-5 at PageID# 29; Doc. No. 1-6 at PageID# 31; Doc. No. 32-1 at PageID# 1381-82.)

DFP personnel attested in an affidavit that they presented Azteca with manuals for the equipment after equipment was installed and after training was concluded.  (Doc. 31-4 at PageID# 1296, ¶ 9.)  Those manuals contained a one-page certificate titled "Limited Warranty Diversified Fall Protection, Ltd." (hereinafter the "Manual Warranty").  (*Id.*; *see also id.* at PageID# 1298.)  However, Azteca personnel attested in an affidavit that the first time they ever saw the Manual Warranty was during this litigation.  (Doc. No. 32-1 at PageID# 1346, ¶¶ 10-11; *id.* at PageID# 1354-55; *id.* at PageID# 1379, ¶¶ 7-8; *id.* at PageID# 1384; *id.* at PageID# 1387, ¶¶ 7-8; *id.* at PageID# 1390.)

The Manual Warranty contained the following pertinent provisions:

> I. A ONE YEAR WARRANTY SHALL APPLY TO ALL SAFETY SYSTEMS INSTALLED BY DFP.
>
> a. DFP will repair or replace without charge, any parts found by inspection to have failed within one year from the date of original installation due to a

69

defect in material or faulty workmanship provided by DFP if notified of such defect in writing within one month after the defect is discovered.

b. The obligation to replace any parts within the warranty period does not require the replacement of the complete assembly but is limited to the part or parts found defective.

c. Parts replaced or replacement services performed with in the one year warranty period are warranted for the balance of the original one year warranty.

\* \* \*

III. GENERAL PROVISIONS

\* \* \*

c. DFP shall not be liable for any loss or damage resulting, directly or indirectly from the loss of use of the system. Without limiting the generality of the foregoing, this exclusion from liability includes damages to property and injury to or death of the person. DFP neither assumes nor authorizes any person to assume for it any other liability in connection, with the sale and normal use of the system, and there are no oral agreements or warranties collateral to or affecting this warranty.

d. This is the sole warranty and in lieu of all other warranties, express, implied or statutory including, but not limited to implied warranty of merchantability or fitness for a particular purpose.

(Doc. 31-4 at PageID# 1298.)

Azteca argued that the Manual Warranty is unenforceable. (Doc. No. 32 at PageID# 1337-40.) Azteca's breach of warranty claims as pled did not invoke the Manual Warranty. (*See* Doc. No. 11.) Instead, the express warranty upon which Azteca predicated its Counterclaim was the "1-year warranty against workmanship and product defects" found in the DFP proposals. (*See id.* at PageID# 258.) The Counterclaim also invoked the express statements in the design drawings prepared after Azteca issued purchase orders approving the DFP proposals. (*See id.* at PageID# 259, ¶¶ 22-24; Doc. No. 11-5.) Parties "are bound by admissions in their pleadings . . . ." *Hughes*, 215 F.3d at 549.

The Court need not wade into any factual discrepancies and disputes as to the Manual

Warranty (*e.g.*, a one versus five-year term). Azteca has not claimed the benefit of the Manual Warranty in Counts One through Three of the Counterclaim. Azteca did not plead a claim based on the Manual Warranty, and in briefing Azteca expressly disavowed the Manual Warranty. "In deciding motions for summary judgment, representations of counsel in a brief are generally treated as admissions." *Nat'l Union Fire Ins. Co. of Pittsburgh v. Arioli*, 941 F. Supp. 646, 655 (E.D. Mich. 1996) (collecting authorities).

For these reasons, Azteca waived the Manual Warranty and any reliance thereon in this litigation. *See generally Systran Fin. Servs. Corp. v. Giant Cement Holding, Inc.*, 252 F. Supp. 2d 500, 506 (N.D. Ohio 2003) ("A party may waive any of its contractual rights . . . ."); *Hausser & Taylor, LLP v. Accelerated Sys. Integration, Inc.*, 2005-Ohio-1017, 2005 WL 563977, at *4 (Ohio Ct. App. 8th Dist. 2005) ("It is well settled that a party may waive any of its contractual rights . . . .").

### J. Azteca's Failure to Plead and Waiver of a Repair or Replace Warranty

Azteca at one point asserted that its "breach of express warranty is premised on two separate grounds: (1) DFP never provided a functioning fall protection system, or, in the alternative, (2) DFP failed to repair or replace the defective systems." (Doc. No. 32 at PageID# 1335.) The Court addresses the second point.

Nowhere in Azteca's breach of express warranty counterclaim is there any mention of a "repair or replace" duty. Nor was any reference to the Manual Warranty pled. (*See* Doc. No. 11.) The Counterclaim provided:

> 54. DFP expressly presented to Azteca that:
>
> a. the FPS 2 was designed as a restraint system;
>
> b. the FPS 2 was designed for (2) users per lifeline;

71

c.  the FPS 2 would not cause "oil canning" to the silo while static; the FPS 2 would not cause "oil canning" to the silo or catastrophic failure of the silo while "energized" or in use;

d.  DFP would provide complete fall protection liability coverage on its engineering, fabrication, installation, and training; and

e.  DFP would provide a 1-year warranty against workmanship and product defects.

*See* Exhibits 1, 3 and 5.[20]

55.  These representations were a material term to the agreement.  Azteca's offer to purchase the FPS 2 was contingent upon DFP's warranties and representations contained in Exhibits 1, 3 and 5, and Azteca would not have purchased the FPS 2 were it not for these warranties and representations.

(Doc. No. 11 at PageID# 263.)

Azteca also urged that the one-year warranty in the DFP proposals did *not* contain a "repair or replace" provision.  Azteca argued that the DFP "proposals make no mention of any specific 'One Year Limited Warranty' to only 'repair and replace' . . . ."  (Doc. No. 32 at PageID# 1323.)  "According to DFP's proposals, DFP provided an express 1-year warranty against workmanship and product defects with no other limitations to the warranty whatsoever and *no reference towards DFP's alleged 'One Year Limited Warranty' to exclusively repair and replace . . . .*"  (*Id*. at PageID# 1338 (emphasis added).)

Azteca was resolute in its brief that the Manual Warranty "was not part of the agreement," (Doc. No. 32 at PageID# 1337), and actually "contradicts the negotiated terms of the parties that are clearly documented in the proposals and Design Drawings" (*id.* at PageID# 1339).  This Manual Warranty that "DFP alleges to have slipped into the packing of its systems – which Azteca denies – contradicts the negotiated express warranties DFP provided Azteca in the

---

[20] Azteca's Counterclaim Exhibits 1 and 3 were the DFP proposals.  Exhibit 5 was the final schematic drawing prepared in the Fall of 2014.  (*See* Doc. Nos. 11-1, 11-3, & 11-5.)

proposals and Design Drawings and, therefore, is invalid and not enforceable." (*Id.*)

Notwithstanding, Azteca argued that "because Azteca's breach of express warranty is premised on DFP's promise to repair and replace the custom-made fall protection systems, the statute of limitations did not begin upon delivery of the systems, but rather when DFP failed to repair or replace the redesigned systems in September 2017." (Doc. No. 32 at PageID# 1337.) A section of Azteca's brief was devoted to the timing of accrual for a claim of breach of warranty based on failure to repair or replace. (*See* Doc. No. 32 at PageID# 1335-37.)

"To the extent [Azteca] seeks to expand its claims to assert new theories, it may not do so in response to summary judgment . . . ." *Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007). "Rather, if a plaintiff wishes to expand their claim mid-stream – because, for instance, they unearthed new evidence of misconduct in discovery – the proper procedure . . . is to amend the complaint in accordance with Rule 15(a)." *Vonderhaar v. Waymire*, 797 F. App'x 981, 990 (6th Cir. 2020) (quoting *Tucker v. Union of Needletrades, Indus. and Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005)).

Count Two of the Counterclaim raised no express warranties other than those made in 2014 (or early 2015) that formed the parties' original contract. (Doc. No. 11 at PageID# 263, ¶¶ 54-55.) DFP argued persuasively on reply that the "Counterclaim is completely devoid of any allegation centered on a failure to repair or replace of the systems. In fact, the warranty claims focus exclusively on the condition of the systems when they were tendered to Azteca in 2015." (Doc. No. 33 at PageID# 1408.) To the extent Azteca now relies on express warranties made after the DFP proposals and schematics approved in 2014 (or early 2015), which it did not plead in Count Two, summary judgment on that ground is granted in favor of DFP.

### K.  No Particular Purpose Implied Warranty for Redesign

Azteca's final argument went to the timeliness of its implied warranty claim.

> Azteca's claim for breach of implied warranty is not time barred.  Ohio courts have held that the statute of limitations bars implied warranty claims for goods delivered over four years prior to a lawsuit but does not bar implied warranty claims for goods delivered within the four-year period leading up to the lawsuit.  *See Gentek Bldg. Prod., Inc. v. Sherwin-Williams Co.*, No. 1:02CV00013, 2005 WL 6778678, at *10 (N.D. Ohio Feb. 22, 2005).  In this case, DFP shipped fall protection systems to Azteca on three occasions: (1) February and June 2015; (2) July 2016; and (3) May 31, 2017.  Therefore, Azteca has a viable breach of implied warranty claim against DFP for the modified/reengineered systems DFP shipped to Azteca in May 2017 that Azteca approved Design Drawings for on March 23, 2017 – systems that failed to perform as designed just three months later.  *Id.*

(Doc. No. 32 at PageID# 1337 (footnote omitted).)

Azteca somewhat overstated *Gentek*.  In that case, one side argued that implied warranty claims for sales prior to four years ahead of the filing date of the lawsuit would be time-barred under Section 1302.98.  *Gentek*, 2005 WL 6778678, at *10.  The opposing party conceded the point, and the Court agreed that those claims would be barred.  *Id.*  There was not much (if any) discussion of implied warranty claims for sales *within* the four-years ahead of the filing date of the lawsuit – because the movant had not sought summary judgment on those.  *See id.*  In any event, the Court grasps Azteca's basic point on timeliness, which really does not depend on *Gentek*.

Ohio's version of the UCC provides: "Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under section 1302.29 of the Revised Code an implied warranty that the goods shall be fit for such purpose."  Ohio Rev. Code § 1302.28.  "The requirements of R.C. Chapter 1302 apply to contracts, whether oral or written."  *Evilsizor v. Becraft & Sons Gen.*

74

*Contractors, Ltd.*, 806 N.E.2d 614, 617 (Ohio Ct. App. 2d Dist. 2004).

> The existence of an implied warranty of fitness for a particular purpose is contingent on two general facts.  First, the seller must be aware at the time of contracting of a particular purpose for which the buyer intends to use the goods. Second, the buyer must rely on the seller's skill or judgment to select or furnish goods suitable for that particular purpose.

*Price Bros.*, 649 F.2d at 423 (holding that a trial court's finding that the implied warranty of fitness for a particular purpose was clearly erroneous because the buyer had knowledge akin to the seller's regarding the particulars of the goods).

Azteca's implied warranty claim in Count Three alleged: "At the time that DFP sold the FPS 2 equipment, DFP was aware that Azteca intended to use the FPS 2 fall protection system for a particular purpose."  (Doc. No. 11 at PageID# 264 ¶ 61.)  "Despite Azteca's reliance, DFP sold defective FPS 2 fall protection equipment that . . . rendered the FPS 2 fall protection equipment unfit for Azteca's purposes."  (*Id.* at ¶ 63.)  Thus, the Counterclaim pled DFP's knowledge and Azteca's reliance only as to the originally designed equipment sold in 2014, and installed in 2015.

The Counterclaim did not allege anything regarding DFP's knowledge or Azteca's reliance on DFP's skill with respect to redesigned equipment crafted in 2016 and 2017.  That is significant because Azteca admitted that the equipment installed and uninstalled in 2016 and 2017 was *not* the same design as what DFP had originally delivered in 2015.[21]

Moreover, by 2016, Azteca was no longer relying blindly on DFP's skill to design the

---

[21] The Counterclaim alleged that after the October 2015 incident, "DFP began the redesign[.]" (Doc. 11 at PageID# 260 ¶ 34.)  But each "improved version" failed in the same manner as had occurred on October 7, 2015.  (*Id.* at ¶¶ 35-41.)  Azteca described the subsequent failed equipment as "cured fall protection system."  (Doc. No. 32 at PageID# 1328.)

equipment.[22]  As the parties stipulated:

> 40.  On December 12, 2015, DFP prepared a Root Cause Analysis Report with Corrective Forms.
>
> 41.  In order to repair or replace the custom-made fall protection system, DFP hired Charles Miller, Jr. of Element Materials Technology, an independent third-party consultant, to perform tests on the rigid strut assembly, assess the aluminum welds, and make recommendations on weld techniques that could strengthen the design.  The results of those tests were provided to Azteca.
>
> 42.  On July 7, 2016, DFP and Azteca agreed to install a test system in Edinburg silo 11, which incorporated the recommendations of Charles Miller, Jr.  The parties would, then, monitor the test system for several months to see how it reacted to the expansion and compression of the silo.
>
> * * *
>
> 45. On March 23, 2017, DFP presented the modified system to Azteca and provided design specification drawings for the modifications which were approved by Azteca.

(SF ¶¶ 40-41, 45.)

This situation appears like that in *Price Brothers*, where the Sixth Circuit held:

> The trial court's conclusion that [seller] breached an implied warranty of fitness for a particular purpose must be reversed because of the degree of specificity of [buyer's] purchase order and [buyer's] own undisputed high degree of knowledge regarding the mechanical requirements of its own pipe wrapping machine make any finding that [buyer] relied on [seller's] selection clearly erroneous.

649 F.2d at 423.  Here, Azteca reviewed and approved the technical specifications for the

redesigned equipment in 2016 and 2017.  It did so not by relying solely on DFP but instead with

the benefit of a third party's input regarding the changes DFP made in design and welding

methods.  Returning to *Price Brothers*, the Sixth Circuit continued:

---

[22] For present purposes, the Court may assume *arguendo* that the implied warranty of fitness for a particular purpose arose and applied to the original contract and originally delivered equipment.

> Furthermore, the implied warranty of fitness of UCC [§] 1302.28 is not readily applicable when the buyer enjoys skill or knowledge equal to that of the seller. . . . [Buyer] was well acquainted with its own particular needs, and while [buyer] might properly seek consultation with [seller] regarding [seller's] components, it would be unreasonable for [buyer] to completely defer judgment to [seller] to select components for inclusion in [buyer's] unique equipment.  The facts of [buyer's] knowledge and skill and the specific purchase order make actual reliance by [buyer] on [seller] so unlikely that a finding of such reliance would be clearly erroneous.  Therefore, no warranty of fitness for a particular purpose arose from the sales transaction in this case, and the trial court's conclusion that [seller] breached such a warranty was error.

*Id.* at 424 (citations omitted).

Azteca failed to plead any of the following as to 2016 and 2017: DFP's knowledge, Azteca's reliance, or how the special purpose or understanding of Azteca's needs had evolved or become more informed based on past events and the insight of outside professionals.  Moreover, the undisputed facts in the record and the events of 2015 and 2016 show that Azteca could not objectively and reasonably rely on DFP's skill to the level necessary to render the implied warranty of fitness for a particular purpose applicable as to the 2016 and 2017 redesigned equipment.

Azteca may not construct a new theory of implied warranty as to redesigned equipment from 2016 and 2017 for the first time in summary judgment papers.  To the extent Azteca argued Count Three of the Counterclaim based on the implied warranty of fitness for a particular purpose for redesigned equipment in 2016 and 2017, summary judgment is granted in favor of DFP.

### III.  <u>Conclusion</u>

DFP's motion for summary judgment on Azteca's Counterclaims is GRANTED.

Azteca's motion for summary judgment on the claims in DFP's Complaint is GRANTED.

**IT IS SO ORDERED.**

Date: April 21, 2023

_____
BRIDGET MEEHAN BRENNAN
UNITED STATES DISTRICT JUDGE